**SANDERS ASSOCIATES, INC.**

v.

**The UNITED STATES.**

**No. 119–69.**

United States Court of Claims.
March 20, 1970.

John W. Douglas, Washington, D. C., atty. of record, for plaintiff. John B. Denniston, G. R. Poehner, and Covington & Burling, Washington, D. C., of counsel.

M. Morton Weinstein, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant. Steven L. Cohen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

This is an action by plaintiff, Sanders Associates, Inc., to recover either in quantum meruit the reasonable value of the goods and services delivered to and accepted by the Navy Department or for breach of contract because defendant failed to definitize the Letter Contract (Count I); or, in the alternative, to recover the cost of the goods and services delivered to and accepted by the Navy under the Memorandum of Agreement of September 12, 1968, which plaintiff claims is a binding contract (Count II). The case is now before this court on defendant's motion for summary judgment and plaintiff's opposition thereto. For reasons hereinafter stated, defendant's motion for summary judgment is denied, and the case is remanded to the commissioner for a trial to make findings of fact and a recommended conclusion of law.

Plaintiff is a corporation organized and existing under the laws of the State of Delaware, and it maintains its principal offices at Nashua, New Hampshire. On January 27, 1966, plaintiff entered into Letter Contract NOw(A) 66–0356 with what is now the Naval Air Systems Command (NAVAIR) for the production of electronic countermeasures equipment. The Letter Contract provided that, within 180 days or not later than the completion of 50 percent of the supplies, the contract was to be definitized along the lines of a cost-plus-award-fee contract. If the contract was not definitized within the prescribed period, the contracting officer was to give notice that the Letter Contract was terminated, and plaintiff would then be paid in accordance with the provisions of the termination clause.[1]

---

[1]. The definitization clause of the Letter Contract provides in part:

"(b) The target date for definization [sic] of this contract is one hundred and eighty (180) days after the date of this Letter Contract. This Letter Contract is terminated, *upon notice by the Contracting Officer*, in the event it is not superseded by a definitized contract not later than one hundred and eighty (180) days from the effective date of this contract, or not later than the completion of 50%

On June 20, 1966, plaintiff submitted its first definitization proposal to the Navy in accordance with the requirements of the Letter Contract. In October 1966, this proposal was rejected by defendant, but no action was taken by the contracting officer to terminate the contract.[2] In June 1967, plaintiff submitted a second definitization proposal, which again was rejected by defendant. On January 26, 1968, at the Navy's request, plaintiff submitted a third cost-plus-award-fee definitization proposal. In response to this last proposal, the contracting officer advised plaintiff that the Navy wished to definitize the Letter Contract along the lines of a firm-fixed-price contract rather than the cost-plus-award-fee contract, as originally provided. for in the Letter Contract. Plaintiff agreed to this request, and negotiations commenced between the parties on this basis.

Early in the negotiations, the parties were able to agree on the approximate amount of $105,000,000 as the cost basis for the basic units under production or to be produced, but they were unable to agree on the level of profit which plaintiff was entitled to receive. On July 31, 1968, plaintiff made a firm-fixed-price offer of $142,875,193, which covered the basic units, some additional equipment ordered by defendant, and plaintiff's profit. One month later, defendant responded with an offer of $140,536,263, which was intended to yield a profit of $13,161,047 or 9.99 percent of negotiated costs. Plaintiff at first rejected this proposal, but after being assured by Admiral Townsend, Commander of the Naval Air Systems Command, that the terms of the offer were agreeable to him,[3] plaintiff went ahead and accepted the offer. Accordingly, on September 12, 1968, plaintiff and defendant entered into a Memorandum of Agreement providing for a firm fixed price of $140,536,-263.[4]

On December 18, 1968, plaintiff was orally advised that the Chief of Naval Material had refused to accept the terms of the September 12th Memorandum of Agreement, and that the agreement could not, therefore, be implemented. The parties again entered into a series of negotiations, but their efforts again proved unsuccessful. On January 23, 1969, plaintiff requested the Navy to supply it with a written position statement, but defendant refused to do so.[5]

of the production of supplies or performance of work called for under this contract, whichever occurs first. In the event of termination of the performance of work, or any part thereof, pursuant to the termination clause set forth in this contract, or pursuant to this clause for failure of the parties to execute a definitive contract within the prescribed time, the Contractor shall be paid in accordance with the provisions of such termination clause, provided reimbursement of allowable costs and payment of profit shall not exceed the amount set forth in the 'Limitation of Government Liability' clause of this contract." (Emphasis added.)

The "Limitation of Government Liability" clause just referred to provides that the maximum amount for which the Government shall be liable in the event this contract shall be terminated is $15,723,-300.

The Letter Contract did not contain its own termination clause or disputes clause. Instead it incorporated by reference such provisions from the ASPR Regulations.

2. The target date for definitization of the Letter Contract was extended on five different occasions. The last such extension changed the target date to October 18, 1968.

3. Admiral Townsend made it clear, in an affidavit filed by him for purposes of this case, that the price in the Memorandum of Agreement was acceptable to him, but that this did not necessarily mean that it was acceptable to the Office of Naval Material, which had the power to accept or reject the terms of the agreement.

4. The price was subsequently negotiated downward to reflect plaintiff's success in negotiating subcontracts for unexpected low prices.

5. There is a dispute between the parties as to exactly what sort of request was actually made by plaintiff on January 23, 1969. Plaintiff asserts that it merely asked the Navy to supply it with a written position statement as a basis for future negotiations. Defendant contends

Finally the parties, on February 14, 1969, entered into an agreement whereby plaintiff would perform the contract to completion in return for a fee payment of $7,680,000.[6] It was expressly stipulated that this agreement would not in any way prejudice the rights of either party in subsequent litigation. Since this agreement, performance under the contract has been substantially completed by plaintiff.[7] As of December 15, 1969, plaintiff had been paid $129,347,000[8] for reimbursement of costs plus $7,680,000 as a fee or profit.

Plaintiff's petition is divided into two counts. In the first count, plaintiff is seeking to recover, under the theory of quantum meruit, the reasonable value of the goods and services delivered to and accepted by the Navy, which plaintiff alleges to be $144,380,000, plus the reasonable value of the goods and services covered by additional orders which amounts to $10,500,000, together with interest and costs. In Count II, plaintiff alternatively seeks to recover the amount due and owing by defendant as the result of the September 12th Memorandum of Agreement, which plaintiff alleges is a valid and binding contract. Under this count, plaintiff is claiming $140,536,263, plus $10,000,000 for goods and services covered by additional orders, together with interest and costs.

In support of its motion for summary judgment, defendant presents two basic arguments. In respect to Count I, defendant contends that plaintiff failed to exhaust its administrative remedies in that there were several questions of fact redressable under the disputes clause of the Letter Contract which should have been presented first to the Armed Services Board of Contract Appeals (ASBCA). In regard to Count II, defendant argues that the September 12th Memorandum of Agreement was not a binding contract because it had not been approved by the Office of Naval Material and because the Government contracting officer, A. Kevin Fahey, did not have authority to bind the Government without such approval.

## COUNT I

Defendant claims there are three different issues, arising under the Letter Contract, which should have been carried by plaintiff to the ASBCA. The first such issue is the main issue of this case, namely, the dispute over the determination of plaintiff's fee. Defendant's argument is that the fee should have been determined in accordance with the termination clause of the contract. Defendant claims that since the Letter Contract was never definitized by the parties, as required by the contract, therefore the contract was terminated for convenience by the Government. Defendant relies on the doctrine of "constructive"[9] termination which provides

that plaintiff requested Captain Harvey, who had been designated as Special Negotiator, to execute a unilateral price determination, which he refused to do. Defendant supports its position with an affidavit by Captain Harvey to the effect that plaintiff requested a unilateral price determination. Plaintiff counteracts this statement with its own affidavit by John A. Melrose, Vice President of Sanders Associates, Inc., stating that Captain Harvey had been asked for a "written statement of the Navy's position regarding the issues which had not yet been settled."

6. See note 15 infra.

7. John A. Melrose, plaintiff's vice president, stated in an affidavit of December

31, 1969, that as of December 15, 1969, plaintiff had expended 99 percent of its costs and had substantially completed all of the work contemplated by the September 12th Memorandum of Agreement.

8. This figure was obtained from John A. Melrose's affidavit of December 31, 1969. Defendant stated earlier in its motion for summary judgment that plaintiff had been paid $127,111,341 as reimbursement for costs plus $7,680,000 as a fee. A final determination as to the amounts actually paid to plaintiff will be made by the commissioner.

9. We actually find it very difficult to understand how there can really be a constructive termination without some form

that the Government can pay costs based on the termination-for-convenience clause even though the Government does not actually invoke such clause. Warren Bros. Roads Co. v. United States, 355 F.2d 612, 173 Ct.Cl. 714 (1965); Brown & Son Elec. Co. v. United States, 325 F.2d 446, 163 Ct.Cl. 465 (1963); John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964); see College Point Boat Corp. v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925). Consequently, defendant contends that its failure to give notice of termination, as required by the contract, should not operate to prevent it from invoking the termination clause as the means of determining plaintiff's fee.

Defendant further points out that the determination of the fee should have been performed by the ASBCA since there were questions of fact surrounding the termination that needed to be resolved, and since the actual question of what is a reasonable fee was a matter exclusively within the jurisdiction of the Board. Mite Corp., 66–2 BCA ¶ 6052 (1966). In the *Mite* case, there was a letter contract containing a clause which provided that if the contract was not definitized by a certain date it would terminate. The Board in *Mite* concluded that, since the contract was not definitized, it had jurisdiction to determine the amount due, based on the termination clause, despite the fact that the contract had been completed.

Plaintiff's answer to defendant's position is that the Letter Contract was never terminated by defendant either directly or constructively. Plaintiff first argues that the contract specifically requires defendant to give notice of termination,[10] and that defendant's failure to do so caused the contract to stay alive. In fact, it is on this basis that plaintiff distinguishes Mite Corp., *supra*. Plain-

tiff points out that in *Mite* there was no provision requiring the Government to give notice of termination. Consequently, the contract was terminated automatically when the parties failed to reach a definitization agreement. However, in the present case, there is a notice requirement, and this is sufficient to keep the contract from being terminated automatically.

In answer to defendant's constructive termination argument, plaintiff contends that the doctrine as espoused in the cases cited by defendant does not apply to the instant case because here there was a continuation of performance by plaintiff and an acceptance of such performance by defendant. In the cases cited by defendant, the contracts were never completed. Instead, there was a termination by the Government—usually as the result of an alleged breach, and, once it was determined that there was no breach, the plaintiffs were paid as if their contracts had been terminated for the convenience of the Government. Thus, the difference between the cases cited by defendant and the instant case is that even in the so-called constructive termination cases there was some form of an actual termination, whereas in this case there was no termination at all.

■ We agree with plaintiff that, under the particular circumstances of this case, there has been no termination—constructive or otherwise. Certainly, there has been no actual termination, as the result of defendant's failure to provide the required notice. We also agree that there has been no constructive termination because the Letter Contract has been substantially completed, and plaintiff's performance has not only been accepted but requested by defendant. We feel that it would be patently incorrect to allow defendant to say that there is a termination and at the same time accept the fruits of the contract. Defendant, throughout the performance of the con-

---

of notice by the Government that the contract is being terminated either for default or otherwise.

10. See italicized portion of definitization clause in note 1 *supra*.

tract, *never once gave any indication that it considered the Letter Contract terminated.* In fact, defendant, if anything, encouraged plaintiff to continue performance, not only by accepting deliveries but by issuing change orders and increasing the size of the total procurement. Consequently, since we hold that there was no termination by defendant, we find that there was no basis on which plaintiff was obliged to proceed to the ASBCA.

The second point on which defendant bases its contention that plaintiff failed to exhaust its administrative remedies is that plaintiff should have appealed to the ASBCA the refusal of Captain Harvey on January 23, 1969, to issue a unilateral price determination. Defendant's argument is that a refusal by a contracting officer to consider a claim or issue a decision is itself an appealable decision under the disputes clause.[11] Plaintiff's answer to this argument is that Captain Harvey was not a contracting officer for the contract in question but instead was a Special Negotiator.[12] Defendant, however, points out that as Assistant Commander of the Naval Air Systems Command for Contracts, Captain Harvey was clearly a contracting officer, senior to all other contracting officers except the Commander of NAVAIR. Thus, the fact that he was not designated as *the* contracting officer of the Letter Contract in question is immaterial since no one, not even Fahey, was the sole contracting officer.[13] Consequently, it would appear that there is a dispute as to exactly what role Captain Harvey was playing on January 23, 1969.

An additional conflict exists in regard to this issue in that defendant contends that plaintiff requested Captain Harvey to issue a unilateral price determination, whereas plaintiff urges that it only asked for a written statement of position as a basis for future negotiations. Both parties have filed affidavits supporting their particular positions.[14] Consequently, there appears to be another dispute of fact as to exactly what transpired between Captain Harvey, negotiator for the Navy, and John A. Melrose, plaintiff's vice president, on January 23, 1969.

Since the question of what transpired between the parties must be remanded to the commissioner for a factual determination, we will likewise remand the question relating to the authority of Captain Harvey. It may actually be possible for us to reach a decision at this time regarding Captain Harvey's role, but we refrain from doing so since the commissioner's decision may make such a determination unnecessary.

The third and last point on which defendant claims plaintiff should have appealed to the ASBCA is in regard to Modification 43 enacted February 14, 1969, allowing plaintiff to recover a fee of $7,680,000.[15] Defendant's argument

---

11. This argument by defendant actually begs the question since we must first decide whether the claim which the · contracting officer refused to consider is one which is redressable under the disputes clause. Since there is a dispute of fact (as we will show later) as to exactly what kind of request was made by plaintiff, we will not decide this issue at this time.

12. Captain Harvey, in fact, admitted in his affidavit that on January 10, 1969, he was appointed Special Negotiator for the purpose of reopening negotiations with plaintiff to convert the Letter Contract to a cost-plus-fixed-fee contract.

13. It should be noted in this respect that Fahey stated in his affidavit that he was

never appointed contracting officer specifically for the Letter Contract. He, along with other contracting officers, such as Julian Ross, Claude Parks, and Daniel Monaco, took action in regard to the Letter Contract in this case.

14. See note 5 *supra.*

15. Modification 43 reads as follows:

"WHEREAS, *differences of opinion* exist between the parties as respects definitization including contract price, fee or profit and other matters; and

"WHEREAS, there is a question as to whether the Contractor is obligated to continue performance.

"NOW, THEREFORE, in consideration of the premises and the terms and

is that this modification represented its final offer, and if plaintiff wanted to contest the amount of the fee, it would have to proceed by way of litigation, which would include going first to the ASBCA. Defendant further contends that this February 14th amendment provided the Letter Contract with a payments clause, and that any later dispute as to the amount of payment would, therefore, be under this provision and subject to the disputes clause.

Plaintiff argues that Modification 43 only provided for *interim* fee payments and was never meant to be the final word of the Navy on this subject. In fact, the agreement specifically provided that the fee was made "[p]ending final resolution by agreement or adjudication of the differences of opinion between the parties * * *." [16] Thus, plaintiff urges that this agreement did not represent a *final* decision of a contracting officer, and only decisions which are final are appealable to the ASBCA.

██ We feel that the evidence is strong in plaintiff's favor that the agreement of February 14, 1969, was not a final determination by defendant as to the amount of fee it would pay. The repeated use of the word "interim" in reference to the payments, and the references by the parties to their differences of opinion [17] both indicate that neither party intended the fee of

$7,680,000 to be the last word. Instead, we feel that defendant was entering into this agreement in order to persuade plaintiff to complete the contract, knowing all along that the $7,680,000 was not to be the final amount. In fact, it was stated by John A Melrose in his affidavit that subsequent to the February 14th agreement, defendant offered a fee of 8 percent on future as well as past performance.

In addition, we do not feel that there was a dispute at all between the parties in regard to the substance of Modification 43. This was a *bilateral agreement* between the parties whereby plaintiff agreed to continue performance under the Letter Contract in consideration for the payment of an interim fee of $7,680,-000. Since there must be a dispute or an issue of fact over which the parties cannot agree before the ASBCA can assume jurisdiction, there is really no basis for the defendant's argument that this was a matter which should have been carried to the Board. Thus, even if we did determine that Modification 43 was the final decision of the Government, there would still be nothing to appeal to the Board since there would be no dispute between the parties.

In regard to defendant's argument that plaintiff should have appealed the determination of fee to the ASBCA under the payments clause, made a part of the

---

conditions hereinafter set forth, the parties agree as follows:

"1. Subject to payment by the Government to the Contractor of allowable costs pursuant to the clause of this contract entitled 'Allowable Cost, Fixed Fee and Payment' and interim payments on account of fee as provided below, *and without prejudice as to the Contractor's or the Government's position regarding the difference of opinion*, the Contractor shall continue performance of the work until such time as the work and equipment presently ordered has been completed, and the Contractor's other obligations fully satisfied and performed.

"2. *Pending final resolution by agreement or adjudication of the differences of opinion between the parties*, the Contractor shall be paid *interim* payments on account of fee not to exceed $7,680,-

000 with $7,000,000 to be paid upon execution of this supplemental agreement and $680,000 to be paid upon completion of Items 1 through 25, 35 through 66, 68 through 79 and 81. Upon such final resolution, the *interim* payments on account of fee shall be deducted from the profit or fee finally agreed to by the parties or adjudicated in, determining the amount of profit or fee still to be paid the Contractor.

"3. This supplemental agreement establishes *interim* payments on account of fee, but involves no change in the Limitation of Government Liability." (Emphasis added.)

16. See note 15 *supra*.

17. See italicized portions of Modification 43 in note 15 *supra*.

Letter Contract by Modification 43,[18] it is sufficient to say that the payments clause in question is not the type of "specific contract adjustment provision" contemplated by the Court in United States v. Utah Constr. & Mining Co., 384 U.S. 394, 402, 86 S.Ct. 1545, 16 L.Ed. 2d 642 (1966). Just recently this same reasoning was applied by this court in Bird & Sons, Inc. v. United States, 420 F.2d 1051, 190 Ct.Cl. —— (Jan. 1970), where we held that plaintiff's claim for damages was not subject to Board jurisdiction because it was not redressable under the payments clause or any other provision of the contract. *But see* Schlesinger v. United States, 383 F.2d 1004, 181 Ct.Cl. 21 (1967), where we made an exception for a claim involving alleged erroneous price discounts simply because it had become a "settled administrative practice" to subject such claims to the disputes mechanism. We do not feel that the payments clause [19] in this case was cast in terms of contract price adjustment, as specified in *Utah*, such that the parties intended liability to be a matter for administrative disposition under the disputes clause. Instead, we feel that such matters were intended to be subjected to judicial determination under the applicable rules of the law of damages. *See* Len Co. and Associates v. United States, 385 F.2d 438 at 451 n. 18, 181 Ct. Cl. 29 at 51 n. 18 (1967), quoting Moran Towing & Trans. Co., 66–2 BCA ¶ 6027 at 27,852 (1966) (dissenting opinion).

■ We conclude, therefore, in regard to Count I that there has not been a finding or decision of a contracting officer on a question of fact from which plaintiff could appeal to the ASBCA, nor has there been a dispute regarding a question of fact arising under the Letter Contract. Consequently, there was no basis upon which plaintiff was obliged to proceed to the ASBCA, and there are no issues which we can remand at this time, to the Board.

## COUNT II

In Count II, plaintiff, in the alternative, seeks to recover the full contract price specified in the September 12th Memorandum of Agreement, on the ground that such agreement is a valid and binding contract. Defendant's contention is that the agreement is not a valid contract because it was never approved by the Office of Naval Material.

The contract was negotiated by A. Kevin Fahey, representing the Government as contracting officer, and John A. Melrose, representing plaintiff corporation. Plaintiff contends that Fahey had actual authority to negotiate the agreement in question as the result of a Pre-Negotiation Business Clearance issued by the Chief of Naval Material to the Commander, Naval Air Systems Command, stating: "In order to additionally motivate the contractor to perform more economically and meet delivery requirements, *a maximum fee arrangement in excess of 10% will be considered.*" (Emphasis added.) Thus, plaintiff argues that this recognition by the Office of Naval Material that plaintiff was entitled to a profit in excess of 10 percent precluded that office from refusing to grant the Post Negotiation Business Clearance on the grounds that a 10 percent fee was too high.

Defendant's main argument in this respect is that Fahey did not have actual authority to negotiate a binding con-

---

18. In its oral argument, plaintiff contended that Modification 43 was a contract completely separate from the Letter Contract and, therefore, did not incorporate the disputes clause of the Letter Contract. However, we feel certain, based on the copy of the modification included as an exhibit to defendant's motion for summary judgment, that the February 14th agreement was nothing more than a modification or amendment to the Letter Contract and not a separate contract.

19. It should be noted that all contracts have a payments clause, and if we were to allow this particular argument by defendant, then practically all contract disputes would be redressable under the contract and subject to the ASBCA. We do not feel that the Court in *Utah* ever intended such a result.

tract, and that it was therefore necessary to obtain the approval of the Office of Naval Material. In regard to the Pre-Negotiation Business Clearance, defendant points out, and its position is supported by an affidavit from Fahey, that his target fee was 6.9 percent and that "in excess of 10%" represented a maximum fee, which was considered only as a suggestion and not as an authorization. Defendant also includes with its reply brief an affidavit by Mario E. Biciocchi, who was Acting Head of the Division of the Deputy Chief of Naval Material and who signed the Pre-Negotiation Business Clearance in question. In his affidavit, Biciocchi specifically states that his letter provided no authorization to Fahey to grant a 10 percent fee or to take into consideration such percentage in reaching agreement on a firm-fixed-price contract without authorization from the Chief of Naval Material.

The parties raise a number of other arguments in regard to this question of Fahey's authority, but based just on what has been cited, we feel it is obvious that a definite issue of fact exists in regard to this point. Consequently, we find it unnecessary to engage in a discussion of this issue at this time, but, instead, we hold that the question must be remanded to the commissioner to make findings of fact. Therefore, the question of whether plaintiff can recover based on Count II must be delayed pending a determination by the commissioner.

## SUMMARY

In conclusion, since we find that there are basic questions of fact which must be resolved before there can be a final determination of this case, we hold that it would be improper to grant defendant's motion for summary judgment at this time. Defendant's motion is hereby denied without prejudice, and the case is remanded to the commissioner for a full trial, with dispatch, of all the issues of fact.[20]

DAVIS, Judge (concurring).

Joining the court's opinion, I add some supplemental observations (on one aspect of Count I) which are not inconsistent, as I see it, with that opinion. As the court holds, it is clear from the materials presented to us on Count I that (a) the letter contract was never terminated, directly or constructively, (b) the parties continued the letter contract in effect by mutual agreement, and (c) Modification 43 did not purport to establish the final fee but fixed only an interim fee subject to possible enlargement. From these premises it would not be bizarre to argue that the parties implicitly amended the letter contract to agree, in fact, that a "reasonable" fee would be paid, without coming to any accord on the final figure. If this were so, one might then go on to say that the special "payments" clause of the original letter contract —not the separate "payments" clause inserted by Modification 43, which is the only "payments" provision the court's opinion deals with—was a "specific contract adjustment provision" calling for an appeal to the Armed Services Board of Contract Appeals if the parties could not agree upon the amount of the "reasonable" fee.[1]

**20.** Defendant put forth two other arguments why its motion for summary judgment should be granted, namely, that plaintiff's petition is premature since the contract has not been completed, and that this court has no jurisdiction over a claim based on a contract implied in law. Without going into a discussion of these matters, we simply hold that the petition is not premature since the basic contract has been completed, and that this court has long had jurisdiction over implied contract actions seeking recovery in quantum meruit. E. g., Needles for Use and Benefit of Needles v. United States, 101 Ct.Cl. 535, 612 (1944). Both contentions are thereby without merit and insufficient to support defendant's motion for summary judgment.

**1.** The "payments" clause in the original letter contract was as follows:

"(d) Subject to the dollar limitation set forth above, payments on account of cost expenditures during the letter contract

I do not take this path because I have concluded that (leaving Count II aside) the Government never actually undertook to pay any more than the fee set by Modification 43, regardless of whether a higher fee would be "reasonable". The Navy's conduct (still putting Count II apart) shows that it never subjectively agreed to pay whatever fee was determined to be "reasonable". It may be that, in the end, the defendant will be held, under the principles of quasi-contract, to pay such a larger fee, but I feel that the Navy should not be found, on the record before us, to have actually (*i. e.*, in fact) agreed to pay a "reasonable" fee. Therefore, if plaintiff prevails, it will not be "under the contract", in the *Bianchi-Utah-Grace* sense, but either in quantum meruit or for a breach.

period shall be made in accordance with the clause hereof entitled 'Allowable Costs, Fixed Fee, and Payment.' No payments of fee shall be made under this letter contract, except pursuant to a termination settlement."

Modification 43 certainly deleted the last sentence of this provision, and it could also be argued, if an actual agreement on a "reasonable" fee had been made, that that subsequent agreement for a "reasonable" fee gave new content to the clause on "Allowable Costs, *Fixed Fee*, and Payment" (emphasis added), and thereby triggered the "payments" clause quoted above.