Opinion
Spector, Commissioner:
On its merits, this is a relatively uncomplicated “claim against the United States founded *783 * * * upon [any] express * * * contract with, the United States * * [1] However, its disposition on the merits has been deferred for many, many years, as it has struggled in the throes of the “Wunderlich Act” procedures.[2]
In this respect, it is not unlike many another contract case, which has under that Act as interpreted,[3] foundered in the varied complex procedural and jurisdictional problems often presented in such cases.[4] This contract action, however, is relatively unique in the degree of procedural convolutions it presents, the surprising reversal of roles (by counsel) from those customarily seen in Wunderlich Act cases, and in the *784 resultant confusing issues presented in their briefs. A recapitulation of the history of the case to this point is offered in confirmation of the foregoing conclusions.

Preliminary Facts and Statement of the Issues

The National Aeronautics and Space Administration (NASA) after competitive negotiations, awarded plaintiff a construction contract on June 25, 1960, for the design, fabrication, delivery, installation and testing at the site of a complete vacuum system. It is sufficient for our technical understanding to know that the vacuum system was to form part of an overall project characterized as the Mass Transfer Cooling and Aerodynamics Facility being constructed at NASA’s Ames Research Center. As originally contemplated by the specifications, plaintiff would have been responsible for the complete construction of a boiler plant as part of the vacuum system. An amendment to the specification prior to award substituted a requirement that plaintiff supply a boiler plant utilizing Government surplus equipment. As a result, the contract as awarded consisted of two separate items, namely, the vacuum system at $680,000, and the boiler plant at $126,500. Change orders issued in the course of performance increased the total original contract price of $806,500 to $918,984.81. Performance was to be completed hi about a year.
A key provision of the specifications, and the one around which this dispute largely revolves, is paragraph 1-8 [5] providing as follows:

Supervision and Acceptance Test

(a) The Contractor shall provide competent representatives to supervise installation and performance tests as required by this contract.
(b) The Government will conduct a performance test on the ejector system prior to final acceptance under the supervision of the Contractor’s representative. This test will he performed by_ the Government as soon after final installation as facilities will permit. The test will be performed in general accordance with the ASME Power Test Code for Ejectors. In case of a disagreement between the Contractor and the Government, the test will *785 be run in strict accordance with, the Power Test Code. The Contractor will be notified of the date of such test and is to have his representative present.
(c) In the event the ejector system fails to meet the performance requirements, the Contractor shall have 8 months to mahe revisions to correct the performance. At the end of this 6-month period, if the corrections have not been made, the Contractor shall, at the option of the Contracting Officer, do one of the following:
(1) Continue attempts to correct performance.
(2) Reduce the total contract price by a percentage equal to the percentage by which the ejector system fails to meet its specified mass-flow conditions at the pressure indicated. This applies to any of the six specified design points, each design point being one-sixth of the total contract price. [Emphasis supplied.]
To summarize the issues (prior to detailing the facts upon which their resolution depends), the vacuum system had not been completed by June 1961 as scheduled. In an atmosphere of mutual forbearance, the Government took no action to terminate the contract, nor to set a new completion date.[6] By letter of January 8, 1962, plaintiff’s project manager submitted a schedule for preliminary and then acceptance testing of the type contemplated by paragraph 1-3 (b) above-quoted. On April 6, 1962, two of the six ejectors comprising the vacuum system were operated and certain data collected.
One of the issues in the case is whether that limited activity on April 6, 1962, constituted the final acceptance test contemplated by specification 1-3 (b), so as to start the running of the 6-month corrective period described in 1-3 (c) above.
In the period April 6, 1962 to November 30, 1962, plaintiff continued to modify and correct the system,[7] and between November 30 and December 7, 1962, acceptance tests were run on the vacuum systems. It is clear that the Government urgently needed the system, and wanted to take it over and start utilizing it at that time. On the afternoon of December 7, 1962, top level people representing both parties met in the office of defendant’s contracting officer to discuss the status of the project, and testing for acceptance was discon- *786 tiimed that evening. No further work was thereafter performed by plaintiff.
The understandings with which the parties took leave of one another at that time are in dispute and that presents another issue in the case.
The parties have stipulated that the Official Vacuum System Test Result, dated December 12, 1962, “measures the effective results of acceptance tests run during November 30 to December 7, 1962, as against the required performance set forth in Paragraph 3-4 of the Specification. It is agreed that the results indicate a 60.12% achievement against the required performance.”
On these facts (which, of course, do not correspond to the acceptance testing procedures spelled out in paragraph 1-3, above), another issue in the case is whether or not the contracting officer was entitled to exercise the second option available to him at the end of a contemplated 6-month correction period (1-3(c)(2)), and to reduce the total[8] contract price in accordance with the above-stated performance percentage.
It was not, in fact, until February 26,1965 (following correspondence and meetings during 1963 and 1964), that the contracting officer issued a formal decision in accordance with the “Disputes” clause contained in the contract,[9] in which *787 he sought for the first time to invoke the contract price reduction formula described in 1-3 (c)(2) above-quoted. The economic impact of his decision was to reduce the entire contract price (as adjusted by change orders, and including the amount relating to the separately accepted boiler plant), by 39.88 percent of $918,984.81, or $366,491.14. Since the Government still held a final payment on the contract price of $67,-671.73, the decision in effect announced that plaintiff was indebted to the Government in the net amount of $298,819.41. An appeal was taken to the head of the department, represented by the NASA Board of Contract Appeals (BCA), which rendered a decision thereon March 29,1968.
That exhaustive decision by the BCA (followed by a second reaffirming opinion September 19, 1968, on the Government’s motion for reconsideration), allowed plaintiff’s appeal in full. It directed, accordingly, that the contracting officer pay plaintiff the balance of the contract price. NASA, however, did not honor this decision of its BCA. After numerous demands for the final payment of $67,671.73 above-mentioned, and for an additional $28,338.70 (representing settlement of other claims not in dispute), had long gone unheeded, plaintiff on July 28, 1969, sued here for breach of contract in the total sum of $96,010.43. Whether or not it constitutes a breach of contract for NASA to have failed to honor the decision of its BCA rendered in accordance with the standard “Disputes” clause,[10] is another issue in the case. That is, in fact, the threshold issue.

The BcA Decision

The NASA decision on appeal reviews in great detail the testimony and other evidence addressed to the first two issues above-summarized. Dealing with these points of whether or not the April 6, 1962 activity, and/or the activities terminating on December 7, 1962, constituted “performance test[s] * * * prior to final acceptance * * *” within the meaning of specification 1-3 (b) above, the BCA opinion ex *788 haustively recites all of the events and conversations preceding, during, and following those dates. A repetition of that lengthy review of the evidence by the board, would serve no useful purpose in this opinion. But the BCA’s decision does terminate in comprehensive “Findings and Conclusions,” which are hereinafter quoted because they are essential to the disposition of this case:
FINDINGS AND CONCLUSIONS
Based on the evidence reviewed above, the Board has come to certain conclusions and has made certain find-on the issues in this case:
1. The first important question considered is, was the test performed on April 6,1962, the test contemplated in Paragraph 1-3(b) of the Specification?
The provision for that test stated “the Contractor will be notified of the date of such test,” the apparent inference being that the Government will determine when the test will be run. There is no evidence any notice was given to Appellant by the Government that a test would be run on April 6, 1962. It was Appellant’s project manager, Mr. Haire, who notified Mr. Stine that he was going to perform a test on April 6 and invited Mr. Stine to observe it.
The Specification also provided that “the Government will conduct a performance test.” The evidence shows that Appellant’s Mr. Haire was the one who conducted the test, which Mr. Stine observed and on which he recorded certain data.
The same paragraph further provides that the test “will be performed in general accordance with the ASME Power Test Code for Ejectors.” A detail of the procedure under this Code provided that the instruments used in performing the test would be calibrated, but this was not done. While the instruments might have been calibrated after the test, and if their accuracy was found correct, the test data might have been accepted, there is no evidence the instruments were calibrated at any time in connection with the test of April 6th. A copy of the Code was not used during the test, and neither Mr. Plaire nor Mr. Stine considered the test was conducted in accordance with its
There was considerable testimony on the difference between and the meaning of shakedown, preliminary, performance, and acceptance tests and the time and under what circumstances each is conducted. The evi *789 dence indicates that the test of April 6th was a so-called “shakedown” or preliminary test, not an acceptance test.' The informality with which it was conducted and the lack of completeness characterized the test as such. Shakedown or preliminary tests at some stage prior to formal acceptance are considered usual and accepted engineering practice. After the test of April 6 no notice was given Appellant by the Government, nor did its course of action indicate that it considered that test as the test contemplated in the Specification.
Government personnel who were to be trained by the Appellant in the operation of the system, as provided for in Paragraph 11-2 (c) of the contract, had not received their training by April 6.

The Board finds that the test of April 6, 1962, did not comply with and was not the test provided for in Paragraph 1-3 the Specification.

It is therefore not necessary to consider the Appellant’s contention that the Government elected the first option under Paragraph 1-3 (c) by failing to invoke the reduction formula in October 1962.
2. Was the test performed on November 30-Decem-ber 7, 1962, the test contemplated in Paragraph 1-3 (b) of the
While it is not clear whether the Government gave actual notice of the test to be performed on November 30-December 7, it was performed and both Appellant's Mr. Havre and Government personnel participated. Government personnel were in charge of running the test; it was condacted for the most part in accordance with the ASME Power Test Code; the instruments were calibrated; and the test data gathered were accepted by both the Appellcmt and the Government as the measure of performance against the Specification requirements the contract.

The Board folds that the test of November 30-December 7, 1962, was the test contemplated in Paragraph 1-3 the

3. Based on the finding that the test of November 30-December 7 was the test contemplated in Paragraph 1-3 (b), which both parties agreed showed that the ejector system had failed to meet the contract performance requirements, did the Government allow the Appellant 6 months to make revisions to correct performance as provided in Paragraph 1-3 (c) ?
The evidence showed that the Government urgently needed this system to perform research and development tests. Even though the contract completion date was *790 many months past, the Government was hoping the Appellant could successfully complete the contract. It gave the Appellant every opportunity and even assisted in some details of the work. It was apparent on December 7 that the system did not meet performance requirements and that Appellant had no immediate solution for correcting the system. The system was considered adequate to perform some work in its then condition.
A meeting was held in the Contracting Officer’s office on December 7, attended by several Government personnel and Appellant’s Mr. Haire. Whether Appellant was ordered or invited to leave the site of the work is not clear, hut without question the Government decided to take possession of the equipment at that time and use it for a period of months.
On the same day of the meeting, December 7, 1962, and after the meeting was over, Mr. Haire, as agreed at the meeting, wrote the Contracting Officer a letter which stated,
“Acceptance tests of the Vacuum System performance have not, at this date, been completed. It is, however, your desire to accept the unit, since the measured performance is adequate.
“Joint tests by NASA and SWECO personnel will continue until twelve o’clock midnight of this date. At this time, the material and workmanship warranties are effective.”
The reference in the last sentence of the letter is to a warranty clause in the contract separate from and in addition to the provisions of Paragraph 1-3 of the Specification.
No reply was made to Mr. Haire’s letter, and it may he assumed that it reflected the understanding arrived at during the meetmg. No mention is made in the letter whether the Appellant was expected at some future time to return and attempt to improve performance, and no reference is made to the 6 month period provided for in Paragraph 1-3(c).
The above reference paragraph provided that the Appellant had 6 months after the prescribed test to make revisions to correct performance. At the end of this period the Contracting Officer had an option to (1) continue to allow the Appellant to correct performance, or the reduction formula.
Before the Government was entitled to exercise the option, the Appellant was entitled to an opportunity to correct performance for 6 months. The Government has argued that the Appellant, by its course of conduct and *791 statements on and about December 7, 1962, elected to forego this opportunity. The Appellant has argued conversely that the Government deprived it of this opportunity. It is apparent to the Board, from the evidence summarized above, that an understanding was reached on and about December 7, 196%, that the Government would be using the facility for its own programs for the foreseeable futiere, and that the Appellant reasonably believed that the Government would offer it an opportunity to make corrections to the system at a time when such work would be convenient to the Government.
While the Appellant did not offer to return and attempt to correct performance, except for a casual suggestion made by the Appellant’s attorney at a conference in July 1963, the Board is of the opinion that primary responsibility rested with the Government to ofer the Appellant an opportunity to correct performance before it was entitled to applly the price reduction formula. This responsibility devolved upon the Government as a result of the understanding reached during December 1962, regarding the Government’s projected use of the facility. Although the letters from the Contracting Officer of May 10 and June 25, 1963, referred to a reduction in price, neither letter nor any other notice from the Government to the Appellant offered it an opportunity to correct performance.

The Board therefore finds that the Government did not give the Appellant 6 months to correct performance as provided in Paragraph 1-3(c) of the Specification.

4. The Government took the position that the Appellant abandoned further performance of the contract on December 7, 1962 and this constituted an anticipatory breach, so the Government was under no obligation to allow the Appellant 6 months to correct performance, and it could invoke the price reduction provision. It alleged the Appellant did not have the necessary finances or at least was unwilling to spend any more money to further attempt to correct performance. It offered evidence that Mr. Haire said he was at the end of “fixes.”
Without question the Appellant did leave the site of the work shortly after December 7, 1962, and never returned to correct performance. It discharged some of its personnel on December 7, who had been working on the system. It removed its facilities, although this was apparently at the request of the Government and the facilities could have been readily returned. Appellant never offered to return to correct performance or advise the *792 Government wbat steps it would take to improve performance if it did attempt to do so.
The Appellant, in contradiction of the Government’s claim, offered evidence that it had ample funds and credit and could expend considerably more, if necessary, to improve performance. Whether the Appellant had lost money on the contract or the cause of such a loss is immaterial so long as the Appellant had the necessary funds and was willing to spend it to attempt to correct
The evidence offered by the Appellant was to the effect that Mr. Haire did not have authority to decide whether corrective action would be taken or to allocate money for that purpose. The officials of the Appellant who dm have this authority never decided to abandon the contract., and there was no evidence other than Mr. Haire’s remarks, that the Appellant might not perform further work.
There was evidence that preliminary plans were considered by the Appellant after December 7 to perform major redesign and fabrication to correct performance, but information about such plans was never conveyed to the Government or actual steps taken to put these plans in effect. It may be that Appellant was hopeful the Government would consider its taking possession of the system on December 7 as final acceptance.
í» í» Í- $
The Board finds that the Appellant did not demonstrate a positive intention, not to perform, did not abandon the contract, and cannot be chojrgea with an anticipatory breach, which would allow the Government to invoke the price reduction provision in Paragraph 1-3(c)(2) of the Specification without allowing the Appellant the 6 month period to correct performance.
5. The Government has contended, in the alternative, that even if a reduction of the contract price pursuant to the reduction formula is improper, the Government is nevertheless entitled to an equitable adjustment in the contract price under the “Changes” clause because the specification requirements were not satisfied. The Government argues specifically that it has, in effect, “* * * permitted the Appellant to meet a less rigid requirement than that called for in the Specification. The work which was ‘omitted’ as a result of the relaxation of the performance requirement from 100% to 60.12% constituted a constructive change’ for which the Government is entitled to a downward equitable adjustment in contract *793 price.” This contention was not raised in the Contracting Officer's final decision dated February 26, 1965, and appears for the first time in the Government's Answer in this appeal.
All of the witnesses who testified on the subject agreed that there was no actual change in the contract specifications, no formal contract change notification or change order was ever issued, nor written notification given Appellant that the Government was claiming a constructive change prior to filing of the Government’s Answer in this appeal.
While Appellant was put on notice that the Government might seek a reduction in the contract price as the Contracting Officer indicated in his letters to Appellant of May 10 and June 25,1963, he gave no indication that such a claim was based on a constructive change. The Contracting Officer, in his final decision from which Appellant appealed, focused the Government’s claim against Appellant on the provision in Paragraph 1-3 (c) (2) of the Specification and did not make a finding that there had been a constructive change.
The evidence thus supports the finding that the Government never relaxed the specification requirements or otherwise held the Appellant accountable for anything less than the full system performance required by Paragraph 3-4 of the Specification. Indeed, the Government's attempts to invoke the reduction formula further demonstrate a course of conduct inconsistent with the view that the specification requirements were changed.
Even if the Government could, at one time, have proceeded under the “Changes” clause, its delay for over two years in seeking to do so must be considered to bar any present entitlement of the Government to a downward equitable adjustment in the contract price. * * *

*****

As discussed above, the Government did not provide the Appellant with the 6 month period to make corrections to which the Appellant had a right under the contract. After failing to abide by its obligations under Paragraph 1-3, the Government cannot now seek to turn this failure to its advantage, well after the expiration of the period during which it might reasonably have proceeded under the “Changes" clause.
The Board therefore finds that the Specifications were not changed, either actually or constructively, and the Government’s present assertion that the performance *794 requirements of the Specification were constructively changed must be regarded in any event as untimely.
Appellant has alleged that the price reduction formula referred to in Paragraph 1-3 (c) (2) was a penalty and does not meet the criteria for an enforceable liquidated damage provision. In light of the other findings of the Board, a discussion of this point would only be academic. [Footnotes omitted. Emphasis supplied.]

The Judicial Proceedings

As earlier mentioned, the failure of NASA to implement the foregoing decision ultimately resulted in a petition in this court alleging breach of contract under 28 U.S.C. § 1491 for failure of NASA to pay in accordance with its decision. The petition, however, also inconsistently cited 41 U.S.C. § 341 [sic] [11] requesting review of the BCA decision by measurement against the Wunderlich Act standards.
Defendant’s answer acknowledges that the facts found by the NASA BCA as above-summarized are entitled to finality under the Wunderlich Act standards; but that the board’s decision to the effect that “the Contracting Officer is directed to pay the Appellant the balance of the contract price” is a “conclusion of law not final in this litigation, and in no way controlling with respect to defendant’s set-off and counterclaim, pleaded infra. (41 U.S.C. 322 (1964)).”
By way of “setoff and/or counterclaim and or claim for reformation,” defendant relies on the facts found by the NASA BCA and “facts to be alleged and proved in de novo proceedings before this Court.”[12] Its theory is breach by plaintiff, or an action for reformation.[13] In asserting that theory the answer alleges that “defendant is not entitled to recover under any specific relief giving provision of the said contract. Bather, defendant relies upon this conclusion to *795 establish that this claim is for relief not available to it under contract.”[14]
Defendant alleges it is entitled to judgment “for all contractual payments previously made less the value of the actual benefit it has received.” Alternatively, it asks for the “greater of: (1) the cost required to correct plaintiff’s performance; or, (2) the amount by which the value of the facility was diminished by reason of the fact that it achieved only 60.12% of required contract performance * * Also, alternatively, it seeks “the reformation of [the] contract * * * to state the parties’ mutual agreement that the facility would be utilized at its value as of December 7, 1962 or would be corrected by plaintiff, or at plaintiff’s expense, to meet contractual specifications.” In any event, defendant asks that the exact amounts “be determined by de novo proceedings herein.”
Following joinder of issue, plaintiff moved for summary judgment under Rule 101 (a) “on the grounds that no genuine issue of fact exists * * * and that Plaintiff is entitled to recover as a matter of law” on its claim, and to dismissal of the earlier described set-off or counterclaim. Plowever, paralleling the above-described inconsistency in its petition, this motion also cited Rule 162 (c) (one of the rules pertaining to Wunderlich Act reviews), as requiring specificity in defendant’s pleading insofar as it sought review of the NASA BCA decision. Also inconsistently, plaintiff requested “a conference with, or oral argument before, the Commissioner in connection with Plaintiff’s Motion for Summary Judgment.”[15]
A conference served to clarify plaintiff’s intent. As confirmed by letter of July 8, 1970, plaintiff requested that “a Commissioner’s opinion be issued on the merits of the motion and any cross-motion filed by the Government.” Pursuant to Rule 54(a), this was authorized by order of the court filed August 13, 1970.

*796
Contentions of the Parties

The “Disputes” clause present in this agreement under which the contracting officer and NASA BCA considered plaintiff’s claim, authorizes them to render a decision on “any dispute concerning a question of fact arising under this contract which is not disposed of by agreement.”[16] Unlike the current mandatory “Disputes” clause,[17] it does not authorize nor make any reference to consideration of incidental law questions. But that distinction would appear to be academic. Both parties reiterate that they concur in the facts as found by the BCA. They differ with, respect to what are deemed to be conclusions of law drawn from those facts; and as to these, the BCA opinion would enjoy no finality under the wording of either clause.[18]
Briefly summarized, plaintiff describes the “basic question” as “whether the Government may unilaterally and arbitrarily refuse to abide by a decision of the NASA Board of Contract Appeals holding that Plaintiff is entitled to the monies withheld by the Government under the subject contract.” It argues that by failing to abide by its own decision and by now seeking “to resurrect remedies that were available to it seven years ago,” the defendant is seeking to avoid the decision of its own board, and that to deny relief to plaintiff would be unfair and “result in a serious degradation of the administrative procedure for settling disputes.”
Plaintiff further argues that defendant’s “reformation” remedy is not available because:
1. That equitable relief “lies beyond the general jurisdiction of this Court, except perhaps as ancillary to an award of monetary relief.”[19]
2. Even where available, reformation is afforded only where the parties have a written agreement which mis *797 takenly fails to reflect their actual agreement.[20] There is no evidence here whatever that the parties herein had an agreement here different from the one they detailed in writing.
3. This “reformation” remedy was, in effect, also urged upon the NASA BOA as an alleged “agreement” of what was to take place after the December 1962 tests.It was rejected by the board on the facts the board found, and also by the conclusions the board reached.
It is further urged by plaintiff that following performance testing, defendant had a number of contractual avenues open to it, and that the NASA BCA obviously considered defendant’s counterclaim as one “redressable under the contract” in its exhaustive opinion above-summarized.[21] It is therefore charged that defendant has failed to exhaust its administrative remedy, when it now suggests a different label for the same claim here.[22] Kecognizing that the doctrine of “exhaustion of administrative remedies” has arisen in the different context of the Administrative Procedure Act agencies (where it is usually urged by defendant against a private citizen), plaintiff herein sees no reason why it should not be equally applied against the United States.[23]
In its initial brief, plaintiff complains that the Government’s alternative theories of restitution were not raised until 7 years after it took over the subject matter of this contract and that “the Government is not, as it were, entitled to the advantage of a series of hedgehog defenses behind which it can retire seriatim as each predecessor defense is overcome.” Plaintiff’s principal reliance is on the decision of this court in Roberts v. United States, 174 Ct. Cl. 940, 952-53, 357 F.2d 938, 946-47 (1966), in which this court stated:
* * * By the Government’s acquiescence and silence, plaintiff was led to believe that no claim would be asserted for the savings. Under these circumstances we hold that the failure of the contracting officer to make an equitable adjustment, within a reasonable time after it was apparent that savings had been realized and in time for the contractor to appeal any dispute on the *798 matter to tbe head of the department, constituted a waiver by the Government of any entitlement to the claimed savings. As this court stated in Branch Banking and Trust Company v. United States, 120 Ct. Cl. 72, 88, 98, F. Supp. 757 (1951), cert. denied 342 U.S. 893, when the Government is acting in its proprietary capacity, it may be estopped by an act of waiver in the same manner as a private contractor. Such a result is justified by the plain language of the contract and accords with the principles of fair dealing.
It is plaintiff's position that the Government also is barred by the judicial doctrine of “collateral estoppel” [24] where, as here, the parties had a full opportunity to resolve their issues in the agency proceedings.[25]
Finally, plaintiff contends that even when measured against the so-called Wunderlich Act standards,[26] the BCA decision is entitled to finality because it is correct as a matter of law,[27] the facts as found by the agency being undisputed. By taking over the work, defendant waived known non-conformities; and by depriving plaintiff of the 6-month correction period mandated by the contract, defendant destroyed plaintiff’s valuable contract rights, including the right to alter the system pursuant to change order.[28] Plaintiff observes that there is no evidence to show that it could not have met its obligations under the contract had it not been frustrated *799 by Government takeover of the project, and that defendant took 7 years to raise this issue. The delay itself, plaintiff repeatedly observes, has greatly handicapped it in its opportunity to disprove defendant’s counterclaim, a counterclaim which in any event was raised in the board proceedings, and disposed of by the BCA decision.
As one would expect, defendant’s contentions are the “flip-over” side of the contentions above-summarized. The Government urges that the BCA decision was an error of law. Furthermore, it contends that the board, in reaching its decision “considered only the merits of the Government’s counterclaims; but was completely silent on the question of why, when plaintiff did not perform all of the work required by the contract, it was entitled to the full contract price.”[29]
Defendant further contends that the mere failure of NASA to comply with its BCA decision does not constitute a breach of contract.[30] On the contrary, it contends, plaintiff’s failure to comply with the contract constituted a breach; and as a corollary to this, defendant argues that it was a breach by plaintiff not “redressable under the contract.”[31] Therefore, defendant urges, its counterclaim is not barred by the doctrine of “collateral estoppel” or “failure to exhaust” its agency remedy before the BCA.
Defendant excuses its failure to seek “reformation” as such before the BCA, on the ground that it was a theory of relief “beyond the jurisdiction of the Board,” and it now seeks a trial on that theory.[32]
CONCLUSIONS
For initial disposition is the issue of whether NASA’s failure to implement by payment its BCA’s decisions of March 29 and September 18, 1968, constituted a breach of contract. Until relatively recently, it was accepted practice *800 to regard the purely contractual arrangements authorizing one party of the contract to decide with limited finality, certain types of claims filed by the other party, as a resolution or settlement of their differences when that decision was acceptable to the aggrieved party. Stated another way, it was not deemed appropriate for the party which had designated itself in the “Disputes” clause to decide these matters, to then disavow or in effect to “appeal” the decision it had made.[33]
This is not to say that “Disputes” article decisions favorable to a claimant have not in the past been collaterally attacked by another Government agency, namely, the General Accounting Office headed by the Comptroller General.[34] However, these attacks were rarely successful, and the judicial tests applied were whether or not the decision was based on “fraud or overreaching,”[35] rather than the “finality” standards set forth in the “Disputes” article.[36] Generally, in the *801 case of payments wrongfully, erroneously or illegally made, suit was by tbe United States as plaintiff,[37] or by way of counterclaim,[38] but not via the mechanism of the “Disputes” article.
Following the Bianchi decision,[39] however, this court in Langenfelder & Son, Inc.[40] and in Acme Process Equipment Co.,[41] held that a decision rendered pursuant to a “Disputes” clause, and favorable to the claimant, could nevertheless be challenged by the Government, and specifically against the “finality” standards set forth in that “Disputes” provision.[42] The issue was then recently and squarely presented in S & E Contractors.[43] Therein a closely divided court confronted the issue of whether the Wunderlich Act[44] “affords the Government a right to obtain judicial review — coextensive with that of the contractor — of decisions of administrative tribunals unfavorable to it, on contract claims made in the course of the standard ‘disputes’ procedure under the Wunderlich Act.” It concluded that the Act, read in the light of its legislative history, was intended to confer such a right.*
S & E is not “on all fours” with this case. In S & E, the contracting parties were in agreement on the contractor’s entitlement at the conclusion of the “disputes” procedures; but payment was frustrated in that case by the intervention of the General Accounting Office, compelling plaintiff to bring suit in this count. The majority disagreed with the trial commissioner’s opinion that this constituted a breach of the “disputes” provision in the contract. It held in S & E (193 Ct. Cl. at 340-41, 433 F. 2d at 1315) that:
* * * When a Wunderlich Act case is pending here, the only question is how much finality attaches to the *802 findings and holdings of the Board set up to execute the powers of the head of the agency in the premises. Beally it makes no difference now whether the failure of defendant to pay out as the Board determined results, as here, from the Comptroller General’s implied threat to charge the certifying officer’s account, or from a change of heart in the agency itself, as was the case in C. J. Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 341 F. 2d 600 (1965). We hold that in either event, a refusal by defendant to pay a Board award is not a breach of the disputes clause if the involved award is not supported by substantial evidence or otherwise is not entitled to finality under the Wunderlich Act. * * * [Emphasis supplied.] [45]
Collins, Judge [193 Ct. Cl. at 370, 379, 382, 433 F. 2d at 1392, 1397, 1399]
*803 It follows, in this case, that the failure of NASA to honor the decision of its BCA, did not constitute a breach of contract, as urged upon us by plaintiff herein, and opposed by defendant.[46] The decision of the NASA BCA will therefore be reviewed against the standards set forth in the “disputes” provision contained in the contract.[47]
That task is relatively uncomplicated in this instance. The board proceedings appear to have been competently conducted and the opinion which flowed therefrom is unusually comprehensive. This typical Government contract, requiring interpretation herein, is quite typically voluminous and detailed. All of the facts, and the contemporaneous activities of the parties and their representatives in aid of any interpretative issues, have been exhaustively developed in the board opinion. The parties are in agreement thereon. Under all of these circumstances, defendant’s argument[48] that there should be further trial proceedings in this court (or back at the board) cannot be seriously regarded.
This is hardly a case of “defective or inadequate” [49] agency proceedings warranting a de novo trial here. Nor can defendant seriously expect a retrial of the same issues considered in the BCA decision, by couching them in different terms, or relying on different theories to support the very same issues.[50] It is a simple fact that since its inception, the issues in this case have been framed by a claim of plaintiff for an undisputed and unpaid contract balance, and the fact that its claim is more than offset by defendant’s counterclaims for a reduction in the contract price under paragraph 1-3 of the specifications; or alternatively under the theory of a constructive change. For defendant to press the same counterclaim in this proceeding as a “breach” by plaintiff, *804 or as a plea for “reformation” is the very exercise in semantics barred by the Utah and Morrison-Knudsen cases.[51]
It is not uncommon for a party urging its interpretation of a contract instrument upon a court, to phrase its plea erroneously as one for “reformation”; but the remedy of reformation is something quite different. This is not the case of a written agreement which mistakenly fails to reflect an actual agreement.[52] As plaintiff points out, there is not a scintilla of evidence that the parties here reached an agreement different from the one drafted in detail by defendant. This is, as a matter of fact, the same argument made to and rejected by the NASA BOA under the theory that there had been a “constructive change order” to the agreement.
Turning to the BOA decision, the conclusions set forth earlier in detail are clearly conclusions on questions of law, or at the very least, on mixed questions of law and fact in which the law ingredient is predominant, essential, and in all respects crucial.[53] They interpret the agreement between the parties, in the light of the agreed facts.[54]
On a de novo review of those conclusions, it is determined that they are in all respects correct. The defendant clearly failed to comply with the provisions of specification paragraph 1-3 (c) in depriving plaintiff of its contract right to “6 months to make revisions to correct the performance,” because of the Government’s decision in its own best interests to utilize the system then and there. Afforded that opportunity, plaintiff might very well have been able to effect corrections satisfactory to the Government at a cost far less than the formula reduction permitted at the end of the 6-months’ period (even assuming that the formula was properly applied by the contracting officer in this case).
This decision was for the Government’s benefit. It also deprived plaintiff of the opportunity to demonstrate that the Government’s original design was not satisfactory, and to *805 request a change order altering it to make is satisfactory.[55] There was no reply (and therefore assumed concurrence) to plaintiff’s letter of December 7, 1962, to the effect that “[i]t is, however, your desire to accept the unit, since the measured performance is adequate.” The board concluded that “it may be assumed that it reflected the understanding arrived at during the meeting.”
Such understandings, or waivers, are not uncommon when deemed advantageous to the Government.[56] Moreover, in rejecting defendant’s alternative argument that a “constructive change” had occurred, the board correctly observed that there was no evidence of a change, and that the Government’s “delay for over two years in seeking to do so must be considered to bar any present entitlement of the Government to a downward equitable adjustment in the contract price.” The decision of this court in Roberts v. United States, 174 Ct. Cl. 940, 357 F. 2d 938 (1966), partially quoted earlier in the text, is in full accord with this legal conclusion of the board.
Closely parallel also, are those cases in which the Government exercises its rights under the standard “Termination for Convenience” (of the Government) article, thereby obligating itself to pay the contractor all performance costs to the date of termination. This has been regularly held to require payment to the contractor of the cost of material not in compliance with the contract specifications,[57] on the basis that the Government deprived the contractor of a later opportunity to conform the inventory to the specifications, by its act of termination.
For the reasons stated in the BCA decision and the additional reasons set forth above, it is concluded that plaintiff is entitled to be paid in accordance with that decision.
Becommended Conclusion of Law
Plaintiff’s motion for summary judgment is granted, defendant’s cross-motions are denied, and judgment is entered for plaintiff in the sum of ninety-six thousand, ten dollars *806 and forty-three cents ($96,010.48). Defendant’s counterclaim is accordingly dismissed.
On December 22, 1971 the court issued the following order:
ORDER
Following the filing of findings, an opinion, and recommended conclusions of law by Commissioner Spector on July 26,1971, this case comes before the court on a stipulation of the parties filed December 9, 1971, and amended December 13 and 17, 1971, signed on behalf of the plaintiff and the defendant by the respective attorneys of record, in which it is stated that a written offer was submitted by the plaintiff to the Attorney General and duly accepted on behalf of the defendant, whereby plaintiff agreed to accept the sum of $94,317.43 in full settlement of all claims set forth in the petition, and the defendant consented to the entry of judgment in that amount. Defendant also consented to the dismissal of its counterclaim filed herein on January 26, 1970.
IT IS THEREFORE ORDERED that judgment be and the same is entered for the plaintiff in the sum of ninety-four thousand three hundred seventeen dollars and forty-three cents ($94,317.43).
IT IS FURTHER ORDERED that defendant’s counterclaim be and the same is dismissed.
BY THE COURT
(Sgd.) Wilson Cowen Chief Judge
*807 JUDGMENT ORDERS August 1, 1971 to December 31, 1971

 28 U.S.C. § 1491.

 41 U.S.C. §§ 321-22; also often referred to as the “Anti-Wunderlich Act” because of a legislative history demonstrating that its passage was a Congressional reaction to the decision of the Supreme Court in United States v. Wunderlich, 342 U.S. 98 (1951). (See Hearings on H.R. 1839 & S. 24, H.R. 3634 and H.R. 6946 Before Subcomm. No. 1 of the House Comm. on the Judiciary, 83d Cong., 1st & 2d Sess. (1953-54) ; Hearings on S. 2487 Before a Subcomm. of the Senate Comm. on the Judiciary, 82d Cong., 2d Sess. (1952).)

 See United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963).

 See, for examples, Briscoe v. United States, 194 Ct. Cl. 866, 442 F. 2d 953 (1971) ; Edward R. Marden Corp. v. United States, 194 Ct. Cl. 799, 442 F. 2d 364 (May 1971) ; Cosmo Constr. v. United States, 194 Ct. Cl. 559, 439 F. 2d 160 (1971) ; Merritt-Chapman & Scott Corp. v. United States, 194 Ct. Cl. 461, 439 F.2d 185 (1971) ; American Chem. Soc’y v. United States, 194 Ct. Cl. 370, 438 F.2d 597 (1971) ; Charles T. Parker Constr. Co. v. United States, 193 Ct. Cl. 320, 433 F.2d 771 (1970) ; S & E Contractors, Inc. v. United States, 193 Ct. Cl. 335, 433 F. 2d 1373 (1970), reversed 406 U.S. - (1972) ; Sanders Associates, Inc. v. United States, 191 Ct. Cl. 157, 423 F.2d 291 (1970) ; J. L. Simmons Co. v. United States, 188 Ct. Cl. 684, 412 F.2d 1360 (1969) ; Nolan Bros., Inc. v. United States, 186 Ct. Cl. 602, 405 F.2d 1250 (1969) ; Clack v. United States, 184 Ct. Cl. 40, 395 F.2d 773 (1968) ; J. A. Jones Constr. Co. v. United States, 184 Ct. Cl. 1, 395 F.2d 783 (1968) ; Capobianco v. United States, 184 Ct. Cl. 160, 394 F.2d 515 (1968) ; Eager Elec. Co. v. United States, 184 Ct. Cl. 390, 396 F.2d 977 (1968) ; Centre Mfg. Co. v. United States, 183 Ct. Cl. 115, 392 F.2d 229 (1968) ; J. A. Terteling & Sons v. United States, 182 Ct. Cl. 691, 390 F.2d 926 (1968) ; Universal Ecsco Corp. v. United Stales, 181 Ct. Cl. 10, 385 F.2d 421 (1967) ; Len Co. v. United States, 181 Ct. Cl. 29, 385 F.2d 438 (1967) ; Maxwell Dynamometer Co. v. United States, 181 Ct. Cl. 607, 386 F.2d 855 (1987) ; New York Shipbuilding Corp. v. United States, 180 Ct. Cl. 446, 385 F.2d 427 (1967) ; Southwest Welding & Mfg. Co. v. United States, 179 Ct. Cl. 39, 373 F.2d 982 (1967) ; Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 369 F.2d 701 (1966) ; Nager Elec. Co. v. United States, 177 Ct. Cl. 234, 368 F.2d 847 (1966) ; Hol-Gar Mfg. Corp. v. United States, 175 Ct. Cl. 518, 360 F.2d 634 (1966) ; Thompson Ramo Wooldridge, Inc. v. United States, 175 Ct. Cl. 527, 361 F.2d 222 (1966) ; J. G. Watts Constr. Co. v. United States, 174 Ct. Cl. 1, 355 F.2d 573 (1966) ; Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 355 F.2d 554 (1966) ; Roberts v. United States, 174 Ct. Cl. 940, 357 F.2d 938 (1966) ; Morrison-Knudsen Co. v. United Stales, 170 Ct. Cl. 757, 345 F.2d 833 (1965) ; Universal Ecsco Corp. v. United States, 170 Ct. Cl. 809, 345 F.2d 586 (1965) ; C. J. Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 341 F.2d 600 (1965) ; Robert E. Lee & Co. v. United States, 164 Ct. Cl. 365, 370 (1964) ; and WPB Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 8, 323 F.2d 874, 877-78 (1963).

 As amended by specification addendum No. 6, March 18, 1960.

 Cf. DeVito v. United States, 188 Ct. Cl. 979, 413 F.2d 1147 (1969) ; Cuneo, Waiver of the Due Date in Government Contracts, 43 Va. L. Rev. 1 (1957).

 The boiler plant was separately and formally accepted by the Government on or about August 28, 1962.

 Still another Issue Is presented by plaintiff’s contention that the earlier-described division of the contract Into two Items (one of which, via., the boiler plant, had earlier been accepted), resulted in the formation of two separate contracts, for the purpose of applying a percentage reduction. Also at Issue at one time was whether change order additions to the contract price were to be considered, in applying a percentage reduction formula to the “contract price.”

 “DISPUTES
“Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive : Provided, That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor *787 shall be afforded an opportunity to be beard and tp offer evidence In support of Its appeal. Pending final decision of tbe dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.”

 Note 9 supra.

 Obviously intended to be 41 U.S.C. §§ 321 — 22, note 2 supra.

 Cf. Bianchi, note 3 supra.

 This court bas been described as the court in which “the Government is always the defendant.” Kipps, A Unique national Court: The United Slates Court of Claims, 53 A.B.A.J. 1025 (1967) ; Bennett, The United States Court of Claims, a 50-Year Perspective, 29 Fed. B.J., 284, 289 (1970), and articles cited therein at notes 2 and 18. Rule 40 “Counterclaims,” however, clearly contemplates counterclaims “exceeding in amount or different in hind from that sought in the petition.”

 Obviously this is intended to meet the tests for a plaintiff’s entitlement to a trial in this court, as spelled out in United States v. Utah Constr. & Mining Co., 394 U.S. 394 (1966).

 A motion for summary judgment under Rule 101(a) suspends the reference of a ease to a commissioner. (Rule 14(b) (2).)

 Note 9 supra.

 Which contains a subparagraph b., as follows:
“ (b) This ‘Disputes’ clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, That nothing in this contract shall be construed as making final the decision of any administrative ofiicial, representative, or board on a question of law. DPR 1-7.101-12 ; 41 C.F.R. 1-7.101-12.”

 See also, Bianchi, note 3 supra.

 Citing United States v. Milliken Imprinting Co., 202 U.S. 168 (1906) ; and United States v. Jones, 131 U.S. 1 (1889).

 Citing 2 Corbin, Contracts §§ 334-45.

 Citing Utah, note 14 supra.

 Utah, note 14 supra at 419-20.

 United States v. Joseph A. Holpuch Co., 328 U.S. 234 (1946) ; and United States v. Blair, 321 U.S. 730 (1944).

 See Bianchi, note 3 supra.

 See Utah, note 14 supra at 419-22.

 See test at note 18 supra.

 Note 2 supra, § 322. The plaintiff quotes from the board’s reaffirming decision following defendant’s motion for reconsideration, as follows:
“* * * Whether the balance of rights and obligations created between the parties by this decision is equitable or inequitable depends on an evaluation of all of the circumstances. It is true that the Government is being required to pay the full contract price for a facility which satisfied only 60.12% of specification performance requirements when the Appellant ceased work. However, this result is not based on a mere legal technicality, but on the Government’s neglect in failing to comply with the requirements of Paragraph 1-3(b) of the Specification. We do not know whether the Appellant ever would have fabricated a system meeting full performance requirements. The critical matter is that the Government never provided the Appellant with an opportunity to do so, as required by Paragraph l-3(b). Moreover, the Government did not utilize any of the other remedies which it might have invoked under the contract — the ‘Guarantee’ clause, the ‘Termination for Default' clause or the ‘Changes’ clause. While seeking to characterize the Appellant’s recovery as a windfall, the Government is ignoring its own neglect, and the fact that the Appellant was deprived of a contract right. In view of all of the circumstances, the Board can reach no other decision.”

 It is apparent that defendant found it necessary to alter the design, after it beneficially occupied the project, there being frequent references to this in the record, and in the BCA opinions.

 This contention is wholly unsupported by a reading of the BCA decision. The board decision approached that issue on the basis that the contract price was due and owing, unless the Government counterclaim was valid. The final words of its decision are that “the Contracting Officer is directed to pay the Appellant the balance of the contract price.” [Emphasis supplied.]

 Citing Acme Process Equip. Co. v. United States, 171 Ct. Cl. 251, 257-59, 347 F. 2d 538, 543-44 (1965) ; and S & E Contractors, Inc. v. United States, 193 Ct. Cl. 335, 433 F. 2d 1373 (1970), reversed 406 U.S.- (1972).

 See note 14 supra.

 Cf. Bianchi, note 3 supra.

 See, for example, United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 429 (1966) ; United States v. Corliss Steam-Engine Co., 91 U.S. 321 (1875) ; Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 343 F. 2d 951 (1965) ; Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F. 2d 173 (1963) ; Atlas Can Corp., ASBCA Nos. 1957, 1958, & 2121, 59-2 BCA ¶ 2354 (1959) ; Adams Mfg. Co., ASBCA Nos. 5321, 5507, 59-2 BCA ¶ 2454 (1959) ; Report Prepared for the Senate Select Comm. on Small Business (Petrovitz, Methods of Resolving Contract Controversies Pertaining to Government Contracts and Subcontracts: An Empirical and Analytical Study), S. Doc. No. 99, 89th Cong., 2d Sess. at 3, et seq., 159 (1966) ; Hearings on H.R. 67 Before Subcomm. for Special Investigations of House Comm. on Armed Services, 85th Cong. 2d Sess., 794-95 (1958) ; ASPR ¶ 1.314(g), 32 C.F.R. 1.314(g) (1971); FPR § 5-60.101(a), 41 C.F.R. § 5-60.101 (a) (1971) (these being so-called procurement regulations held to have the force and effect of law in G. L. Christian & Associates v. United States, 160 Ct. Cl. 1, 312 E. 2d 418, cert. denied, 375 U.S. 954 (1963)) ; Frenzen, Some Thoughts on the Similarity of Boards of Contract Appeals and Commercial Arbitration, 3 Pub. Coot. L.J. (A.B.A.) 56, 60, et seq. (1970) ; Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law & Contemp. Prob. 39 at 40, 72-73 (1964).

 See, for example, Bell Aircraft Corp. v. United States, 120 Ct. Cl. 398, 100 E. Supp. 661 (1951), aff’d 344 U.S. 860 (1952) ; McShain Co. v. United States, 83 Ct. Cl. 405, 409-10 (1936) ; Albina Marine Iron Works, Inc. v. United States, 79 Ct. Cl. 714, 719-20 (1934) ; Maryland Dredging & Contracting Co. v. United States, 66 Ct. Cl. 627 (1929) ; Penn Bridge Co. v. United States, 59 Ct. Cl. 892, 896-98 (1924) ; Consolidated Vultee Aircraft Corp. v. United States, 97 F. Supp. 948 (1951) ; and John H. Mathis Co. v. United States, 79 E. Supp. 703, 708 (1948).

 United States v. Mason & Hanger Co., 260 U.S. 323 (1922) ; Bell Aircraft, note 34 supra; McShain, note 34 supra; Albina Marine Iron Works, note 34 supra; Maryland Dredging & Contracting, note 34 supra; Leeds & Northrup Co. v. United States, 101 F. Supp. 999 (1951) ; Consolidated Vultee, note 34 supra; James Graham Mfg. Co. v. United States, 91 E. Supp. 715, 716 (1950) ; and Mathis, note 34 supra. See also Op. Att’y Gen. No. 33 (January 16, 1969).

 As that article was worded both prior and subsequent to enactment of the Anti-Wunderlich Act, note 2 supra.

 See, e.q., J. W. Bateson Co. v. United States, 308 F. 2d 510 (5th Cir. 1962).

 See, e.q., Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 371-72, 312 F. 2d 408, 417 (1963).

 See note 3 supra.

 Note 4 supra, 169 Ct. Cl. at 477, 341 F. 2d at 607.

 Note 30 supra, 171 Ct. Cl. at 258-59, 347 F. 2d at 543-44.

 But cf. Simmons, note 4 supra, 188 Ct. Cl. at 719, 412 F. 2d at 1380, in which a BCA decision favorable to a contractor, but not thereafter paid by the agency, was found to be “manifestly correct and fully supported by the ease law,” following which judgment was entered thereon.

 Note 30 supra.

 Note 2 supra.

 Incidentally, the Supreme Court on April 24, 1972, reversed the S & E decision, 406 U.S.-.

 The dissenting opinions observe that there Is no longer a controversy once the contracting parties have officially come into agreement.
“The decision of the majority that an executive agency can appeal to this court from a Board’s adverse decision is wide of the marie and must be considered as pure dicta, because there Is no appeal by an agency from a Board’s decision in this ease * * *.
*****
“The majority cites the cases of C. J. Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 341 F. 2d 600 (1960) and Acme Procese Co. v. United States, 171 Ct. Cl. 251, 347 F. 2d 538 (1965) in support of its decision. These cases are distinguishable on the facts and issues from the case before us. In the Acme case there was a Board decision, but there is none here. In Langenfelder the agency repudiated its decision and attempted to reopen the hearing in order to reverse it, which is not the case here.
“Should it appear that those eases in any way conflict with the opinions herein expressed, to that extent I would overrule them." [Emphasis supplied.]
Skelton, Judge; Cowen, Chief Judge, concurring. [193 Ct. Cl. at 355, 358, 433 F. 2d at 1383, 1385]
*****
“I concur in Judge Skelton's opinion except that I would hold that, in failing to pay its own award, the ABC breached its contract with S á B. * * *
* * * * *
“This brings me to a consideration of the court’s holding that a refusal by the Government to pay a board award is not a breach of the ‘disputes’ clause, even though the refusal results ‘from a change of heart in the agency itself,’ if the involved award is not entitled to finality under the Wunderlich Act.* * * [Emphasis supplied.] To hold to the contrary, the court reasons, would violate the terms of the act.
“As I have pointed out previously, the act had, and has, a very limited purpose — -to overcome the effect of the Wunderlich decision. Since, at the time that decision was rendered, it would have been unprecedented for an agency to repudiate, or to seek judicial confirmation of, its own decision, I find it difficult to believe that Congress ever intended to confer this right which would vastly change the disputes procedure. Congress’ intent, express and implied, was to return to the disputes process as it had existed before Wunderlich, not to introduce radically different, new elements into that process.
*****
“The statements in C. J. Langenfelder & Son v. United States, 169 Ct. Cl. 465, 341 F. 2d 600 (1965), and Acme Process Co. v. United States, 171 Ct. Cl. 251, 347 F. 2d 538 (1965), upon which the court relies for substantiation of its position, to the extent they are inconsistent with the views expressed herein, should be recognized for their unwisdom and overruled.”

 However, of. American Chem. Soc’y v. United States, 194 Ct. Cl. 370, 438 F.2d 597 (1971), wherein the contractor’s claim was not treated under the “disputes” procedures, but paid by the contracting agency, and then recouped following a decision of the General Accounting Office. Defendant did not raise the issue of “failure to exhaust,” and following a conventional petition alleging an action on the contract, the case was resolved without regard to the standards of finality established for the “disputes” clause by the Wunderlich Act.

 Note 9 supra.

 A unique argument on behalf of defendant.

 See Blanchi, note 3 supra. See also discussion in Anthony Grace & Sons, note 33 supra.

 See Utah, note 14 supra. See also Morrison-Knudsen, note 4 supra.

 Note 50 supra.

 Note 20 supra; see also Jamsar, Inc. v. United States, 194 Ct. Cl. 819, 442 F.2d 930 (1971).

 Ray D. Bolander Co. v. United States, 186 Ct. Cl. 398, 415 (1968).

 Cf. Paschen Contractors, Inc. v. United States, 190 Ct. Cl. 177, 180, 418 F.2d 1360, 1361-62 (1969) ; and Paccon, Inc. v. United States, 185 Ct. Cl. 24, 35, 399 F.2d 162, 169 (1968).

 See note 28 supra; and text at that point.

 Cf. DeVito v. United States, note 6 supra.

 See International Space Corp., 70-2 BCA ¶ 8519 ; Remsel Indus. Inc., 1963 BCA ¶ 3918; Caskel Forge, Inc., 1962 BCA ¶ 3318; and Douglas Corp., 60-1 BCA ¶ 2531.