**MERRITT–CHAPMAN & SCOTT CORP.**

v.

**The UNITED STATES.**

No. 89–64.

United States Court of Claims.
March 19, 1971.

Martin S. Michelson, Hartford, Conn., attorney of record, for plaintiff. Michelson & Kane, Hartford, Conn., of counsel.

---

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.*

The contract out of which this case arose was executed in October 1955 between the Savin Construction Corporation, wholly-owned subsidiary and predecessor in interest of plaintiff,[1] and the Government, acting through the Army Corps of Engineers. It provided for the construction of the New Cumberland Locks and Dam on the Ohio River near Stratton, Ohio, for the originally estimated price of $16,312,765.00. This project was part of a plan for the overall development of the Ohio River for navigational purposes.

Twin locks were to be built and this would involve the construction of three lock walls. Existing Ohio State Highway No. 7 ran through the contemplated construction area and in fact directly over the proposed location of the middle lock wall, for about three quarters of its length. As part of its obligation to acquire the necessary land, defendant was required to relocate a 2-mile section of this State Highway No. 7 under a contract between it and the State of Ohio. Under that agreement, defendant was to construct the subgrade for the relocated highway along the new alignment, following which the State Highway Department would have the permanent pavement placed. The new highway

---

* We have borrowed from the opinion prepared by Commissioner Louis Spector to whom we are indebted. The suspension of proceedings and remand to the Board of Contract Appeals which we order is broader than that recommended by the commissioner, and unlike him we do not make any determination on the substantive merits of the claim.

1. By reason of a supplemental agreement, Modification No. 23, dated October 31, 1958, Savin merged with and assigned all of its assets to plaintiff with the consent of defendant, the plaintiff to be thereafter known as the "contractor." In this opinion, the term "plaintiff" refers to either Savin, or the parent Merritt-Chapman & Scott Corporation, as the case may be, unless a specific corporation is named.

would then be opened to traffic, and the State would transfer the right of way of existing Highway No. 7 to defendant, so that it could be excavated in furtherance of the lock and dam project involved in this case.

The defendant had further obligated itself to orchestrate these two contracts with a third one between the government and the Ohio Edison Company. The latter agreement permitted defendant to use adjacent Ohio Edison Land to dispose of the excavated material generated under this lock and dam contract, provided that disposal operations on Ohio Edison land were terminated by May 1, 1956. This was the only major area available for disposal of excavation, and the contract between defendant and Ohio Edison was made necessary by the latter's acquisition of the land on which to construct a power plant, before the Government could complete its plans for this lock and dam contract. The termination date of May 1, 1956, for disposal on its land, was fixed by the fact that Ohio Edison planned to begin construction of its power plant at that time.

Accordingly, back in March 1955, the Government entered into two contracts for construction of the subgrade along the new alignment of Highway No. 7, relocated to run between the excavation and disposal areas, and scheduled to be completed about October 1, 1955. That work was actually finished, and accepted by defendant, on November 4, 1955. The State had previously awarded a contract for paving the relocated section of Highway No. 7, but because of slippage in the schedule for construction of the subgrade by defendant the paving contractor had to pave with a "winter mix", which then had to be redesigned by the State, and approved. This was accomplished by November 29, 1955.

Moreover, the State on November 7, 1955, had rejected the subgrade con-structed by defendant's contractor. Relatively prolonged negotiations ensued between defendant and the State, including discussions as to which party was to blame. The result was that traffic was not diverted from existing Highway No. 7 until April 14, 1956, on which date that portion of the old roadway within the main lock area was made available to plaintiff. The entire road section within plaintiff's work area was not made available for excavation until June 26, 1956.

The contract involved in this case had meanwhile been advertised for bids back in the late summer of 1955 and was awarded to plaintiff, as already noted, on October 24, 1955. Plaintiff was notified to proceed November 4, 1955.[2] The contract with plaintiff, as advertised and as awarded, provided in pertinent part as follows:

SC-20 ORDER OF WORK.—(a) Except as specified hereunder, the work shall be carried on in such order of precedence as best suits the Contractor's construction schedule. The Contractor is informed that no part of existing State Highway 7 shall be removed until the relocated highway is opened to traffic, *which will be about 1 December 1955.* Work to be performed at the following locations shall be completed not later than the dates specified.

(b) Disposal operations in that portion of the disposal area landward of the relocated highway between approximate Highway Stations $58+00$ and $78+00$ *shall be completed to specified grade by 1 May 1956.* Disposal operations on the remainder of the area shall be completed as early as practicable, but in any event not later than 31 December 1957. [Emphasis supplied.][3]

2. The same day that defendant accepted the subgrade for the new alignment of Highway No. 7.

3. The last sentence in subparagraph (b) was added by Addendum No. 2, October 7, 1955, during the bidding period. It is underscored in the addendum, as is all new material announced therein.

The first date emphasized above was the approximate time plaintiff was promised old Highway No. 7, which was part of its construction site, and which had to be excavated. The second date italicized was the date by which a substantial portion of the excavated material had to be disposed of on the Ohio Edison property, as explained above.

Plaintiff was required to file schedules with the contracting officer which showed the order in which it proposed to carry on the work (GC–5(a)), and which indicated the percentage of completion of a described task at any point in time. The urgency of the contractor's adhering to these schedules is underscored by paragraph GC–5(c):

> Failure of the Contractor to comply with the requirements of the Contracting Officer under the provision shall be grounds for determination by the Contracting Officer that the Contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such determination the Contracting Officer may terminate the Contractor's right to proceed with the work, or any separable part thereof, in accordance with the delays-damages article of the contract.

Upon receiving the formal notice to proceed on November 4, 1955, plaintiff mobilized the men and equipment necessary to initiate construction. It began excavation as the first order of business. As earlier mentioned, existing Highway No. 7 was not in fact made available to plaintiff on or about December 1, 1955, but rather on April 14 and June 26, 1956.

On February 24, 1956, plaintiff wrote the contracting officer as follows:

> Reference is made to a statement contained in Paragraph SC–20 of the specifications reading as follows:

> "The Contractor is informed that no part of existing State Highway 7 shall be removed until the relocated highway is opened to traffic, which will be about 1 December 1955."

> This completion date has not been met and it now appears that it may be an appreciable time before we will be permitted to start the removal of the existing road and embankment. The existence of this condition has already resulted in some delay and additional expense to us and we anticipate that this will be aggravated by continued delay in opening the new highway to traffic.

> Our present purpose is to advise you of our recognition of this condition and to make its existence a matter of record. After the new road is opened to traffic we will be able to determine the importance of the delay as affecting the time for completion and the cost of the work.

On April 21, 1956, plaintiff sent a further letter to the contracting officer, saying that it had expected old Highway No. 7 to be made available to it for excavation on or about December 1, 1955, that its plans had been made on that basis, and that the failure to do this (because of the need to keep the road open for traffic from December through March) "greatly reduced our work area, hampered our operation and prevented us from making proper and scheduled use of the equipment we had available", so that "as a result our work has fallen behind schedule." The letter asked for time-extensions because of this delay.

Other unrelated, excusable delays occurred during May, June, July and August 1956, and on December 24, 1956, the parties executed Modification No. 7, extending the completion time for 120 days, and declaring that "Under General Provision 5, 'Termination for Default-

Damages for Delay-Time Extensions',[4] * * * it has been determined that delay in the performance of said contract was due to causes beyond your control and without your fault or negligence, namely, acts of another contractor in the performance of a contract with the Government; usually severe weather; a nationwide steel strike; and abnormally high river conditions".

Plaintiff noted its claim for the monetary consequences of defendant's failure to provide old Highway No. 7 on time in a letter of December 4, 1959, to the contracting officer, and in a formal claim of June 1, 1961. This demand was refused by the contracting officer and an appeal was taken under the "Suspension of Work" and "Disputes" provisions to the Corps of Engineers Board of Contract Appeals. At the Board hearing, plaintiff urged that its increased costs resulted from the fact that it had been delayed, or partially suspended, by the failure to receive all of the construction site when promised, about December 1, 1955, while at the same time it. was being accelerated by the obligation to complete disposal operations on the Ohio Edison land by May 1, 1956. It described its resultant damages in three categories:

First, increased excavation costs were incurred because the Government, despite its inability to release old Route No. 7, required the contractor to progress its excavation in the area between old and new Routes No. 7, forcing it to work in a narrow, restricted, confined and unproductive area. The V-shaped excavation, which narrowed as it deepened because of slope requirements, acted as a trap for rain and ground water, further hampering excavation.

Second, increased costs were incurred because the Government did not issue a formal order suspending work under the "Suspension of Work" clause, but rather "constructively" suspended the work, that is, effectively withheld part of the cite without formal recognition of that fact. As a result, plaintiff alleged, it was obliged to remain in a state of readiness, mobilized to proceed with excavation as originally planned because it was never formally relieved of the obligation to complete disposal operations on Ohio Edison land by May 1, 1956. Moreover, the excavation wàs the first major element of work in the "critical path" of the project. Other successive elements of the project which controlled overall completion in turn depended on prior completion of excavation. Plaintiff therefore had no choice but to deliver all equipment to the job site in accordance with the approved progress schedule. The idled equipment costs claimed are from that period of time when the equipment was scheduled to commence work, until it was actually able to proceed.

---

4. "5. TERMINATION FOR DEFAULT-DAMAGES FOR DELAY-TIME EXTENSIONS

* * * * *

"(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) thereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to causes beyond the control and without the fault of negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: *Provided*, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof."

Third, increased costs were incurred because of overall delay to the project. Until excavation of the main cofferdam area for construction of the lock walls, the cofferdam could not be constructed, and all other work depended on that. Completion of excavation and of the main cofferdam was delayed until September and October 1956. As a result concrete operations for construction of the lock walls could not be started until November 1956, and had to proceed slowly under winter conditions until the spring of 1957. The net effect was the loss of the 1956 construction season to progress the lock walls, and an overall 6-month delay.

The Board issued four decisions on this claim.[5] The contractor attacks the net of these rulings as internally inconsistent, confusing, and wrong. The Government stoutly supports the opinions as entirely correct. We have studied them carefully, but think it unnecessary to parse and scan the various opinions in any detail. For the reasons given in Part II, *infra*, we are satisfied that the case should go back to the Board for further consideration, and for a further hearing if the parties have any additional evidence to produce.

## I

 Before taking up the reasons why we think a remand called for, we dispose of a threshold issue which the defendant considers dispositive of the whole claim. That argument is that the extension of time granted by Modification No. 7, described *supra*, constituted an accord and satisfaction of this claim for delay damages under the "Suspen-

sion of Work" clause. The Board rejected the contention, and we uphold that decision.

Modification No. 7 rests, not on the "Suspension of Work" article, but on the clause dealing with "Termination for Default-Damages for Delay-Time Extensions" (quoted in footnote 4, *supra*). The latter provision deals exclusively with time extensions; and monetary relief (other than remission of liquidated damages or relief from default termination) is not its principal thrust. A claim such as this, for money damages based on acts of the Government which delay the contractor's performance, would not be available under the provision cited as the basis for Modification No. 7. Such a claim may be filed, as it in fact has been, under the article entitled "Suspension of Work" (set forth in footnote 7, *infra*).

Moreover, the causes of delay recited in that time extension order (Modification No. 7) are foreign to this claim, and "acts of the Government" are not even mentioned as a basis. The proviso at the end of the "Suspension of Work" clause was certainly not intended to suggest that an extension of time was the exclusive remedy of a contractor aggrieved by an act of the Government, because such an interpretation would serve to emasculate the entire clause in which the proviso appears. The two clauses must be read together, if possible,[6] and read in harmony they reflect exactly the procedure followed here. The contractor's claim for monetary relief was not considered under the "Termination for Default-Damages for Delay-Time Extensions" clause (which was given as the

---

5. (1) a determination on liability without considering quantum; (2) a reconsideration, at plaintiff's request, of part of the determination on liability; (3) an opinion denying the Government's request that it reconsider the second opinion; and (4) a determination (on quantum) that no damage had been shown.

 In its first opinion, the Board rejected the Government's contention that the appeal to it was untimely, and then pro-

ceeded to the merits of the issue of liability. Defendant does not challenge in court the ruling on timeliness, and could not well do so.

6. As often held by this court, see, *e. g.*, Embassy Moving & Storage Co. v. United States, 424 F.2d 602, 606, 191 Ct.Cl. 537, 543 (1970). On the reconciliation of the two clauses involved, see John A. Johnson & Sons v. United States, 180 Ct.Cl. 969, 985 (1967).

basis for Modification No. 7) because the proviso at the end of the "Suspension of Work" clause prohibited that, reserving such claims to itself. It follows that Modification No. 7 was not an accord and satisfaction of any monetary claim.

As the Board's decision concludes on this issue, "[t]he modification does not mention acts of the Government or make any reference to a partial suspension of work due to failure to deliver to the contractor access to the construction project as specified in the contract, although the Contracting Officer's finding of fact in support of the modification does mention these factors without allocation of a specific delay to this cause." The Board is correct in its conclusion, after weighing of all the factual evidence, "that the modification evidences only accord and satisfaction as to the length of the various delays suffered by the contractor prior to 1 December 1956, including any delay attributable to the delayed delivery of old Highway 7 right of way."

## II

On the claim itself, the first thing to say is that the contract unequivocally represented that old Highway No. 7, running right through the center of the construction site, would be made available when the relocated highway was opened to traffic, which "will be about 1 December 1955." This flat declaration meant that the plaintiff could rightly expect the old route to be given to it no later than a few days after December 1st, and it could rely on having the road available to it by that time. There is

also no doubt that it was important to the contractor to have the old road accessible for excavation at an early date. In normal course, excavation of that area could not be deferred without delay to the overall project. Moreover, looking forward from plaintiff's point of view, a short range interim completion date called for existing Highway No. 7 to be made promptly available, since it was expected that about 578,000 cubic yards of excavated material would have to be placed on the Ohio Edison land by or before May 1, 1956.

In the light of this schedule, the Board correctly concluded in its first decision that "[t]he only possible reason for inserting this date [about 1 December 1955] was to give the contractor a basis for planning and thus reduce the contingency that would otherwise have to be considered." The Board further said, again correctly, "that the Government *represented* that the old highway would be available about 1 December 1955 and assumed the risk for delays beyond this period * * *." [Emphasis supplied.]

There is likewise no serious question that the Government omitted to live up to this promise. The bulk of the road was not handed over to plaintiff until April 14, 1956, and the rest not until June 26, 1956.

When the defendant was unable to fulfill its warranty, it, of course, failed in a legal obligation. This would have been a breach of contract and actionable, in the absence of a clause such as the "Suspension of Work" article.[7]

---

7. "GC–11. *Suspension of Work.*—The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes addition expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work

for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the Contractor, provided, however, that the suspension was not due to the fault or negligence of the Contractor. Provided, further, that no

That provision is designed for the very purpose of purging the Government of the consequences of what would otherwise be a breach by substituting a claim "redressable under the contract."[8] The failure to hand over the road amounted in effect to a partial suspension of the work by the Government—a stopping by the Government of excavation in that area. It makes no difference, since a suspension actually occurred, whether or not the Government was negligent in meeting its obligation to provide the road; the representation was that the road would be available, not simply that the defendant would use its best efforts. See Abbett Elec. Corp. v. United States, 162 F.Supp. 772, 776, 142 Ct.Cl. 609, 616 (1958). Nor was the partial suspension, resulting from partial withholding of the work site, any the less effective for lack of a formal suspension order under the "Suspension of Work" clause. The concept of the "constructive" suspension—the rule that a contracting officer may not deny relief under the clause by the mere withholding of his order when the work has in fact been effectively suspended—has long been recognized, in the same way that a "constructive change" under the "Changes" clause is now an established element of federal procurement law.[9]

The next critical question is how long this partial suspension lasted. It is here that we think the Board erred, in a very important respect, by confounding the issue of the length of the suspension with the independent problem of whether the suspension caused loss or expense to the plaintiff. It is clear from the text of the clause (footnote 7, *supra*) that these are separate and separable questions. The initial inquiry is whether there has been a suspension for the Government's convenience, either total or partial, and either actual or constructive. When the answer to that query is affirmative, there then emerge two other, separate, issues to be resolved: did the suspension delay the work for an unreasonable length of time, and, if so, did this unreasonable delay cause additional expense or loss.

In this case, the Board seems to us, in much of its thinking,[10] to have rolled all these questions into one, wrongly assuming that a suspension did not occur unless additional expense was possible and was proved. This theme runs throughout the agency's consideration of the claim. Though there appears to be a recognition at some points of the separate identity of the issues, taken as a whole the opinions fail to disentangle the question of the existence of a suspension from the independent issue of what damage the suspension caused or could have caused.

If the Board had faced the former issue squarely, it could not help, we

suspension will be ordered or adjustments made under this paragraph for delays arising as the result of changes ordered or as the result of changed conditions encountered under the respective articles relating to Changes and Changed Conditions or as the result of any delays for which an extension of time may be granted under the Delays-Damages Article of this contract."

8. See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Paccon, Inc. v. United States, 399 F.2d 162, 168–169, 185 Ct.Cl. 24, 35 (1968); Chaney & James Constr. Co. v. United States, 421 F. 2d 728, 190 Ct.Cl. 699 (1970); Mer-

ritt-Chapman & Scott Corp. v. United States, 429 F.2d 431, 192 Ct.Cl. 848 (1970); S. Patti Constr. Co., ASBCA, No. 8423, 1964 BCA ¶ 4225, at 20,504; Nash & Cibinic, Federal Procurement Law, ch. 15, Sec. 3.

9. See, for example, John A. Johnson & Sons, Inc. v. United States, 180 Ct.Cl. 969 (1967); Lewis Constr. Co., ASBCA No. 5509, 60–2 BCA ¶ 2732; Stagg Constr. Co., GSBCA No. 2664, 69–2 BCA ¶ 7914.

10. Three of the Board's four opinions in the case bear on this point and we draw on all of them for our appraisal of what the Board did.

think, but hold that the suspension lasted from about December 1, 1955 until at least April 14, 1956. As we have pointed out, the record is indisputable that that was the period during which the old road was withheld from plaintiff, contrary to the representation in the contract documents. It follows that that was also the period of suspension. Moved by considerations irrelevant to the precise question of the extent of the suspension, the Board phrased its contrary conclusion in different forms in its opinions: "a partial suspension for 18 days between 9 January and 22 January 1956 by reason of the unavailability of unrestricted access to the construction site within a reasonable time after the 1 December 1955 date stated in the contract" (first opinion); "the Government did suspend the Contractor's operation during *some portion* of the period from early January to 14 April 1956 * * * (second opinion, emphasis supplied); [11] "in order for this Board to make a finding that there was a constructive suspension of the work as of a certain date, either wholly or partially, the record must show that except for Government acts, or failure to act, the appellant [plaintiff] could have performed differently or to better advantage" (fourth opinion). These formulations are each erroneous in that they all assume, explicitly or implicitly, that the length of the suspension is a function of the harm found to have been caused to the contractor, rather than solely the measure of the actual number of days the defendant withheld the road after December 1st (or thereabouts). That exact question admits of but one answer —that the withholding did not end before April 14, 1956.

■ In the proper application of the "Suspension of Work" clause, the next inquiry is whether that delay was unreasonably long. Cf. Merritt-Chapman & Scott Corp. v. United States, *supra*, 429 F.2d 431, 192 Ct.Cl. 848 (1970). Again, the record permits of no determination other than that, in the circumstances here, the suspension from (about) December 1, 1955, to April 14, 1956 was unduly long. The Board did not suggest otherwise, and the defendant does not argue that these four-and-a-half months should be deemed a reasonable or tolerably short suspension.

■ The only disputable issues, in considering an equitable adjustment for plaintiff under the clause, are whether this contractor was in fact harmed by the delay and, if so, to what extent. The Board concluded, in its first and fourth opinions, that no harm resulted, and therefore that there were no damages. The parties contest strongly whether these findings are or are not supported by substantial evidence. We do not stop to assess the evidence because we are convinced that the Board's entire consideration of quantum was seriously infected by its erroneous view that the actual suspension was a relatively short period in January 1956, rather than the full period from about December 1, 1955, to April 14, 1956. We do not know what the agency would have decided if it had taken the correct position on this score, nor can we say that the record, as it stands, compels a particular result as to the damage and damages flowing from this partial suspension of more than a third of a year. We must therefore return the case to the Board for further consideration under the correct interpetation of the "Suspension of Work" clause, and the correct measure of the length of the suspension.

11. At another stage in its second opinion, the Board said that it "did not intend to exclude the period of 28 January through 14 April completely from consideration in determining the equitable adjustment", but it is clear from the context that the Board considered the suspension itself to have been confined to January and simply wanted to make clear, in the words just quoted, that "any direct impact" of that suspension could be considered "even though it occurred outside the period in which the partial suspension has been found to exist."

**194**

In the present state of the record, we do not and cannot make any final determination as to the existence or the amount of damages, and we do not intend to preclude the Board from exercising its own judgment and rendering its own decision on these points. But it is not out of place to say that prima facie it does seem that a delay of four-and-one-half months, in the circumstances thus far revealed by the record, would probably lead to some harm to this contractor. It may be that, for various reasons, plaintiff suffered no detriment at all from the withholding of Highway No. 7 for this long period, but, as of now, we do not see that conclusion as either clear or certain.

The Board should allow both parties to present further evidence, if they wish, as to the impact on plaintiff of the suspension, as well as on the amount of damages (if any). The Board should then decide these issues—on the expanded record, or if no further evidence is produced on the existing record—on the twin bases that the suspension lasted for four-and-one-half months and that this length of time was unreasonable in the circumstances.[12]

Further proceedings on plaintiff's motion and defendant's cross-motion for summary judgment are suspended pursuant to Rule 167 for a period of ninety (90) days, and the case is returned to the Corps of Engineers Board of Contract Appeals, to afford the parties the opportunity to obtain administrative resolution by the agency of the two issues of whether the suspension here caused additional expense or loss to the plaintiff, and if so the amount of the resulting equitable adjustment in contract price.

12. Plaintiff asks us to provide that any further proceedings must be before a trial commissioner of this court, but United States v. Anthony Grace & Sons, Inc.,

384 U.S. 424, 428–429 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), forbids that disposition where, as here, additional consideration of factual matters is required.