**ROSCOE–AJAX CONSTRUCTION COMPANY, Inc., and Knickerbocker Construction Corporation**

v.

**The UNITED STATES.**

**No. 199–68.**

United States Court of Claims.

April 14, 1972.

David Morgulas, New York City, attorney of record, for plaintiffs; M. Carl Levine, Morgulas & Foreman, New York City, of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before DAVIS, Acting Chief Judge, LARAMORE, Senior Judge, and COLLINS, SKELTON, NICHOLS, and KASHIWA, Judges.

### ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to prepare and file his opinion on the issues of plaintiffs' motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on May 20, 1971, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's opinion as it relates to plaintiffs' sixth and seventh causes of action and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner's opinion and recommended conclusion, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Accordingly, further proceedings on plain-

tiffs' motion and defendant's cross-motion for summary judgment on the sixth and seventh causes of action are, under Rule 167(a) and (e), stayed for a period of six months to enable plaintiffs to obtain from the General Services Board of Contract Appeals determinations of (a) whether, in connection with the sixth cause of action, plaintiffs encountered such a changed condition as would entitle them to an equitable adjustment under Article 4 of the contract, and (b) whether, in connection with the seventh cause of action, plaintiffs are, on the basis of the proper interpretation of the specifications, entitled to an equitable adjustment under Article 3 of the contract with respect to the installation of the glass involved in this claim.

## OPINION OF COMMISSIONER

GAMER, Commissioner:

Plaintiff entered into a $32,512,000 contract with defendant, acting through the Public Buildings Service, General Services Administration, for the construction of the United States Courthouse and Federal Office Building in San Francisco, California.[1]

The petition herein sets forth seven causes of action in which plaintiff seeks the total amount of $5,480,547, with respect to disputes growing out of its performance of the contract. The first five of these causes are based upon alleged breaches of the contract and are to be tried. However, the sixth and seventh causes are of a nature that would permit administrative adjustment under the contract. These claims were presented to, and denied by, the contracting officer and the General Services Board of Contract Appeals. The Board decisions are here contested by plaintiff's motion for summary judgment, which seeks review under the Wunderlich Act.[2]

The pertinent facts here set forth are as found by the Board.

*Sixth Cause of Action*

Under the contract plaintiff was required, by the installation of a dewatering system, to keep all excavated areas free of water.[3]

Prior to the letting of the contract, defendant had made site borings and had prepared logs therefrom. Section 7 of the specifications contained the provisions concerning "Excavation, Filling and Grading," and Paragraph 7–3 thereof, headed "Subsoil Information," stated that "[t]he existing subsurface soil data logs are shown on the [contract] drawings."[4] The drawings disclosed soil data based on nine test borings which were classified in accordance with the "Unified Soil Classification System." The boring data was prepared by the firm of Dames & Moore, soil mechanics engineers.

Plaintiff commenced its dewatering program by sinking a deepwell. However, since it began pumping sand instead of water (indicating soil of low water filtration) it was abandoned. Plaintiff then sank a second deepwell but the same trouble developed and it too was abandoned.

Thereupon, plaintiff employed Dames & Moore, the same firm that had prepared the boring data for defendant, to advise it concerning its dewatering problem. This firm stated that, in its opinion, it would take ten to twenty deepwells, depending on depth, to dewa-

---

1. The two corporations appearing in the petition as the plaintiffs undertook the contract as a joint venture which, for convenience, will be referred to herein as the plaintiff.

2. 68 Stat. 81 (1954), 41 U.S.C. §§ 321–22 (1964).

3. Paragraph 7–5, "Dewatering," of Section 7, "Excavation, Filling and Grading," of the specifications, provided:

"The Contractor shall furnish, install and maintain and continuously operate a dewatering system that will keep all excavated areas free of water at all times, during the progress of the work."

4. The paragraph went on to provide that "[s]amples of the material to be excavated as taken from the borings on the site are available and may be examined" at a designated location.

ter the site. This was a greater number than plaintiff had anticipated installing.

Plaintiff then changed its dewatering system from deepwells to well-points. Plaintiff commenced the installation of the well-points by jetting but found soil penetration by this process difficult and time-consuming. Accordingly, plaintiff obtained (from Houston, Texas) a special drill. Thereafter, plaintiff was able to proceed with the installation of the well-points in a normal manner.

The contract contained the usual Changed Conditions clause providing for an equitable adjustment if the contractor encountered (a) subsurface conditions differing materially from those indicated in the contract, or (b) physical conditions at the site differing materially from those ordinarily encountered in work of the kind covered by the contract.

While plaintiff was in the process of installing the well-points, it notified the contracting officer it had encountered clay deposits at a certain elevation during its deepwell drilling operations, and that this constituted a soil condition that differed materially from those indicated in the contract. The letter further advised that such deposits had also been encountered during the installation of the well-points. Plaintiff claimed that these changed conditions had increased its dewatering costs.

Upon denial of its claim by the contracting officer, plaintiff, pursuant to the Disputes clause of the contract, appealed to the Board, which conducted a hearing lasting four days, and during which 14 witnesses testified, including experts.[5] Plaintiff claimed entitlement

to an equitable adjustment under either alternative set forth in the Changed Conditions clause. As to its increased costs, it contended that the well-point system it was obliged to use was more expensive than the deepwell system it had contemplated using, and that the cost of installing the well-point system was, by the conditions encountered, in itself increased over what such costs would normally have been.

At the commencement of the hearing, the presiding Board member inquired as to whether plaintiff had calculated its increased costs and presented them to defendant, but plaintiff's counsel responded that it had not. He stated that the presentation "would have come at the second phase, if they found the changed condition. But they immediately denied that there was a changed condition, so that we never got to the question of additional cost." Counsel further stated that plaintiff's costs due to the alleged changed condition were "still accumulating" (since excavation operations were still taking place) so that it was not then in a position to submit its final costs.[6] The presiding Board member thereupon stated, "Well, I wanted to make that clear to both sides, that in view of that situation the only question before the Board is whether or not there does exist a changed condition. Of course, subsequently, if we decide in your favor, you will present your costs to the Public Buildings Service. * * * And they will review it and determine whether or not it is a reasonable cost."[7]

By decision of December 27, 1963, the Board denied the claim which is the sub-

---

5. Plaintiff also encountered, at a different site location and elevation, an impervious deposit of soil (a lens), resulting in a water condition. Plaintiff's claim that this too constituted a changed condition was also denied by the contracting officer and was included in its appeal to the Board.

6. Plaintiff commenced its drilling operations for the installation of the dewatering system in March 1961. It submit-

ted its claim letter to the contracting officer on April 7, 1961. That officer denied the claim on April 10, 1961. The hearing of the Board (at that time called the General Services Administration Board of Review) commenced on November 14, 1961 (the presiding Board member being the Chairman of the Board). Excavation work was still proceeding at that time.

7. Hearing Transcript, Vol. 1, p. 30.

ject of this cause of action.[8] It held that relief is to be accorded under the Changed Conditions clause "only when the change is found to be material," but that plaintiff had failed to prove "the materiality of the alleged change." This failure, the Board held, came about by reason of the testimony of plaintiff's vice-president that, based upon the boring data in the contract drawings, which he concluded indicated a sandy soil of high permeability, he determined that the site could be dewatered by approximately five deepwells around its perimeter. As noted, however, according to plaintiff's consultant, Dames & Moore, it would take ten to twenty wells to dewater the site. The Board construed the Dames & Moore estimate as having been based upon the boring data which the firm had originally prepared (and not, as plaintiff urged, on the basis of the conditions actually found at the site when the consultant was called in). The Board then held that:

> To establish the materiality of the alleged changed condition, it is incumbent upon Appellant to prove first that five deepwells would have dewatered the site if sub-soil conditions were as represented by the Government, and secondly, prove the number of wells required to dewater under sub-soil conditions alleged by Appellant to exist. Without the latter proof, the materiality of the alleged change cannot be established as the same number of deepwells might be adequate for dewatering under either sub-soil condition. Appellant has not established proof on either point. Any change in sub-soil conditions, therefore, has not been proved materi-

al and the Board need not determine, with respect to this phase of the appeal, whether the boring data reflect an accurate classification of the soil since any change encountered would not be compensable under the Changed Conditions clause. (Bd.Op., p. 3)

The Board concluded that, on the basis of the consultant's opinion, as well as that of another expert called by plaintiff,[9] "more than five wells were required"; that the five deepwell estimate had been made by plaintiff's vice-president who, although a civil engineer, was not shown to be "an expert in soil mechanics"; that "[l]ogic compels that we rely on the experts"; and that

> [i]f Appellant miscalculated on the number of deepwells required to dewater the site, relief under the Changed Conditions clause is not authorized. Leal v. United States, *supra* [149 Ct. Cl. 451, 276 F.2d 378 (1960)]. (Bd. Op., p. 4)

On the basis of the above considerations, the Board held that it was not necessary for it to decide whether a changed condition had in fact been encountered since plaintiff had failed to show that the cost of using the well-point system was materially greater than what the cost of using the proper number of deepwells would have been.[10]

The Board clearly erred in dismissing this claim on the described basis and without even deciding whether plaintiff had actually encountered a changed condition. The failure to prove, at the stage of the appeal proceedings at which the hearing was held, the proper number of deepwells that would have been sufficient to dewater the site effi-

---

8. GSBCA No. 608. It did allow the changed condition claim referred to in note 5.

9. The second expert, Mr. Byron J. Prugh, testified that, based on the boring data set forth in the contract, he would have concluded that a dewatering system of approximately six deepwells would be sufficient, although he would have used a type of deepwell, i. e., one with a mesh screen, which he felt was more efficient

than the type plaintiff had used, i. e., one with a slotted screen. The slotted screen, however, was the type that was generally used in the San Francisco area.

10. On plaintiff's motion for reconsideration with respect to the Board's disposition of this claim, the Board, by decision of October 20, 1966, affirmed its previous decision.

ciently should not have been held to constitute a fatal obstacle to the establishment of plaintiff's claim. That question was one related to the appropriate amount of the equitable adjustment, to be considered, if necessary, only after a determination of the question as to whether a changed condition existed. If in fact there was a changed condition, plaintiff would not be entitled to recover all of its cost increase over the cost of five deepwells if it could not feasibly have dewatered the site with such number. If, for instance, a contractor, based on the conditions indicated in the contract drawings, should reasonably have anticipated a seven deepwell dewatering system, then the amount of the change order is to be calculated on the basis of the difference between the reasonable costs of installing and operating such a seven well system and the reasonable costs [11] of the system which was required to be employed. As the court held in Tobin Quarries, Inc. v. United States, 84 F. Supp. 1021, 1023, 114 Ct.Cl. 286, 334 (1949), the amount of the equitable adjustment to which the contractor is entitled as a result of a changed condition is "the difference between what it cost it to do the work and *what it would have cost it if the unforeseen conditions had not been encountered.*" (Emphasis supplied.) *Accord,* General Contracting Corp. v. United States, 96 Ct.Cl. 255, 277 (1942).[12] Accordingly, expenses which the contractor would have been obliged to incur anyway had no changed condition been encountered are not recoverable as part of the equitable adjustment. Paul Hardeman, Inc. v. United States, 406 F. 2d 1357, 186 Ct.Cl. 743 (1969); Kaiser Industries Corp. v. United States, 340 F. 2d 322, 337, 169 Ct.Cl. 310, 335–336 (1965). The amount of an equitable adjustment for a changed condition is thus not based upon the contractor's original estimate. Similarly, where the contractor could reasonably have handled the changed condition with a less expensive method, the amount of the equitable adjustment will be appropriately adjusted. Hoffman v. United States, 340 F.2d 645, 652, 166 Ct.Cl. 39, 51 (1964). Thus any increased costs that the alleged changed condition caused in the installation of the well-point system can also be considered following the determination of whether such a condition in fact existed.

Therefore, while the contractor's miscalculation (if there was one) may cause it to absorb some of the costs over its original estimate, it does not automatically result in its recovering nothing, as the Board here held. Certainly, in view of the express arrangement between the Board and the parties to the effect that the issues would be severed, with only the question of whether there was a changed condition to be tried initially, and with an extensive portion of the hearing thereafter being addressed to that question, the Board should not have terminated the case at such stage without even *deciding* such issue.

The contractor's miscalculation in Leal v. United States, 276 F.2d 378, 149 Ct. Cl. 451 (1960), upon which the Board relied, was of an entirely different nature. There the Corps of Engineers Claims and Appeals Board, unlike the instant Board, did address itself to the question of whether there was a changed condition and held there was not, a holding which this court sustained. The principal basis for rejecting the contractor's claim was the conclusion that the letters "WT" appearing on the contract drawings would indicate a "water table" to an experienced contractor (the contractor admitted it did not know what the symbol meant), and that the contractor should therefore have expected to find the wet materials condition he did actually encounter. It was in that context that the court held "if the contrac-

11. Bruce Constr. Corp. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963).

12. "[The] measure [of the equitable adjustment is] the difference in the cost of completion, and what the cost would have been had the materials been as represented."

tor miscalculated, he cannot recover." 276 F.2d at 384, 149 Ct.Cl. at 462.

The Board's error here is similar to that which occurred in the recent case of Merritt-Chapman & Scott Corp. v. United States, 439 F.2d 185, 194 Ct.Cl. 461 (1971). The issue there involved was whether the Government's failure to make a highway (an important portion of the construction site) available to the contractor by a promised date constituted a work suspension entitling the contractor to an equitable adjustment under the contract's "Suspension of Work" article. The court held that the denial of the claim by the contract appeals board there involved was error since it "wrongly assum[ed] that a suspension did not occur unless additional expense was possible and was proved," that the board had "fail[ed] to disentangle the question of the existence of a suspension from the independent issue of what damage the suspension caused or could have caused," and that the board had erroneously "rolled all these questions into one." 439 F.2d at 192, 194 Ct.Cl. at 474.

█ Plaintiff asks the court to review the administrative record and find that there was a changed condition. However, this determination must in the first instance be made by the Board. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 428–429, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). Accordingly, it is necessary that the proceedings with respect to this cause of action be here suspended so that the Board may determine whether plaintiff in fact encountered a changed condition within the meaning of the contract provision.

*Seventh Cause of Action*

On this dispute the Board again did not reach the merits. In this instance it held, on the basis of the facts hereinafter set forth, that the appeal to it was untimely.

The basic dispute is whether, under a proper interpretation of the specifications, certain glass was to be set with a glazing putty or with caulking. Plaintiff's subcontractor concluded that putty was to be used and, by letter of January 11, 1962, plaintiff submitted to the contracting officer a shop drawing indicating such method, together with a supporting letter of January 8, 1962, from its subcontractor.

By letter of January 16, 1962, the contracting officer advised plaintiff that he had reviewed the subcontractor's letter but that he disagreed with the conclusions reached therein. He therefore rejected the shop drawing and "directed" plaintiff "to proceed with the installation of the * * * glass" in accordance with his interpretation of the specifications.

The subcontractor in turn disagreed with the contracting officer's decision and so advised plaintiff by letter. Plaintiff thereupon forwarded a copy of such letter to the contracting officer and, by its transmittal letter, requested that a meeting be held at which the parties could discuss and consider the problem further.

By letter of February 15, 1962, the contracting officer advised that "[i]n accordance with your requests to hold a meeting to discuss the glazing of the * * * glass * * * I will be happy to meet with you * * *."

The following day, February 16, 1962, the General Services Administration promulgated a regulation which provided, among other things, that a contracting officer making a decision under a contract disputes clause was required to notify the contractor of such decision in writing, the notice to contain a paragraph substantially in conformance with one that was set forth in the regulation. Such paragraph was designed (a) to leave no doubt concerning the fact that the notice constituted the contracting officer's final decision, and (b) to alert the contractor to its appeal rights. The required paragraph stated in part that the notice "is the final decision of the contracting officer"; that "[d]ecisions on disputed questions of fact and on other questions that are subject to the Disputes clause may be appealed in accordance with the provisions of the Disputes

clause"; and that, if the contractor decided "to make such an appeal from this decision," the appeal "must be mailed or otherwise furnished to the contracting officer within thirty days from the date you receive this decision." [13]

Thereafter meetings were held at which the parties discussed the disputed matter and, in addition, conducted a test. Further, on April 26, 1962, plaintiff wrote another letter to the contracting officer pertaining to the matter. However, by letter of May 7, 1962, the contracting officer responded:

This is to acknowledge receipt of your letter of April 26, 1962 regarding glazing.

You are referred to our letter of January 16, 1962, wherein we gave you our written decision. We found no reason to change, and indicated at the meeting and test that we saw no necessity for changing our written decision of January 16, 1962.

By letter of June 19, 1962, to the Administrator of the General Services Administration, plaintiff appealed "from the final decision of the Contracting Officer dated January 16, 1962 and May 7, 1962."

The contracting officer thereupon challenged the timeliness of the appeal since it was not made within thirty days as required by the Disputes clause. In response, plaintiff contended that the contracting officer's letter of May 7, 1962, was the one which finally decided the dispute but that that letter did not constitute a decision from which it was required to appeal within thirty days because of its failure to comply with the provisions of the aforementioned GSA regulation. It therefore urged either that its appeal be deemed timely or that the contracting officer be required to decide the dispute and serve notice thereof in accordance with the requirements of the regulation.

The Board rejected the contention. It held instead that the letter of January 16, 1962, was the "decision of the Contracting Officer on the matter in dispute and was binding on the Appellant within the meaning of the Disputes clause." With respect to plaintiff's reliance on the proceedings subsequent to that letter whereby further consideration was given to the contentions of plaintiff (and its subcontractor) which, plaintiff contended, served to make the dispute "a continuing one * * * so recognized by the Contracting Officer up to May 7, 1962," the Board held that the contracting officer's letter of February 15, 1962 (whereby he agreed to meet for further discussions), "tolled the running of the 30-day appeal period" until May 7, 1962, since the "matter in dispute was under reconsideration by the Contracting Officer" until that date. The Board then held that "the Contracting Officer's letter of May 7, 1962, had the effect of ending his reconsideration and reinstating his decision of January 16, 1962." On this analysis, the Board concluded that plaintiff's appeal of June 19, 1962, was "clearly untimely." [14]

13. GSA Regulation 5–53.602, 27 Fed.Reg. 1458 (1962). The regulation in full was as follows:

"*Notice to Contractor*

"When a contracting officer has decided a disputed matter involving a question of fact, the contractor shall be notified of such decision in writing. The notice shall contain a paragraph substantially as follows:

"This is the final decision of the contracting officer. Decisions on disputed questions of fact and on other questions that are subject to the Disputes clause may be appealed in accordance with the provisions of the Disputes clause. If you decide to make such an appeal from this decision, the appeal (in triplicate) addressed to the Administrator of General Services, General Services Administration, General Services Building, Washington 25, D. C., must be mailed or otherwise furnished to the contracting officer within thirty days from the date you receive this decision. Such appeal should reference this decision and identify the contract. Pending final decision of the dispute, you must proceed diligently with the performance of the contract."

14. On the Board's reasoning, and assuming the contracting officer's letter of January 16, 1962 was received by plain-

In this fashion the Board also disposed of the contention based upon the failure of compliance with the regulation. Since the "final" letter of January 16, 1962, was written prior to the adoption of the February 16, 1962 regulation, the Board held that such compliance was unnecessary. It stated:

With respect to Appellant's position that the May 7, 1962 letter of the Contracting Officer is inadequate as a final decision, the Board finds that that letter did not constitute a final decision *per se*, but is a document reinstating and, in the language of Appellant, confirming the decision of the Contracting Officer of January 16, 1962. As such, the May 7 letter was not required to contain the provisions set forth in GSA Regulation 5–53.602. If the Contracting Officer's action had not tolled the 30-day appeal period, the January 16, 1962 decision would have become final at the end of 30 days. It was the January 16, 1962 decision which became final following the issuance of the May 7 letter.

\* \* \* In the instant appeal, the final decision was the letter of January 16, 1962, and it would have served no practical purpose to have incorporated in the letter of May 7, 1962, the requirements of the aforesaid GSA regulation, as it is clear from the contents of Appellant's letter of June 19, 1962, appealing from the decision of the Contracting Officer, that Appellant recognized the May 7 letter as a confirmation of the January 16 decision, and the Appellant clearly indicates that the appeal is from a final decision \* \* \*. Additionally, Appellant was well aware that the Contracting Officer had issued a written decision under the Disputes clause, and an appeal therefrom was a matter

of contractual right. \* \* \* (Bd. Op., pp. 4–5)

■ The Board clearly erred. The contracting officer's decision of January 16, 1962, was not, as the Board held, "the final decision," for, obviously, the contracting officer's agreement shortly thereafter to meet with plaintiff and its subcontractor, and to reconsider the question, served to keep the matter open and necessarily destroyed any finality the decision theretofore had. As shown, further meetings were in fact held and a test conducted. As the Board itself held:

\* \* \* The Contracting Officer's agreement to meet for further discussions of the disputed subject would have been meaningless unless the purpose was to give Appellant further opportunity to be heard, and if persuaded as to the correctness of Appellant's position, to change his position. Thereafter, until May 7, 1962, the matter in dispute was under reconsideration by the Contracting Officer. (Bd. Op., p. 4)

Accordingly, the Board was mistaken in holding the 30-day period within which plaintiff was required to appeal commenced to run from such January 16, 1962 letter, and that such running was "tolled" by the February 15, 1962 letter, whereby the contracting officer agreed to reconsider the matter, until May 7, 1962, when he ended his reconsideration. The Board cites no authority in support of its unusual "tolling" method of handling such a situation.

Under the circumstances described, and as everyone seems to agree, the contracting officer did not purport to decide the issue finally until his letter of May 7, 1962. As an effective notice of final decision, however, there is also no dispute that the letter did not advise the

tiff on January 17, with the thirty days commencing to run on January 18, and further assuming that the contracting officer's "tolling" letter of February 15 was received by plaintiff on February 16, that date was already the thirtieth day. The Board does not indicate how much time it calculates plaintiff, on its theory, had within which to appeal after it received the letter of May 7, 1962, but on the above basis, it would appear that it would conclude plaintiff had only a few hours in order to complete the tolled thirtieth day.

contractor of its right to appeal within thirty days and otherwise failed to comply with the regulation which had in the meantime been issued. Accordingly, the failure of the agency to comply with its own regulation in this respect prevents the letter from constituting that kind of a final decision under the Disputes article from which the contractor is obligated to appeal within thirty days. Bostwick-Batterson Co. v. United States, 283 F.2d 956, 959, 151 Ct.Cl. 560, 565 (1960).[15] The effect of this dereliction by the agency's contracting officer [16] cannot be erased by the device of regarding the earlier decision—issued at a time prior to the promulgation of the regulation—as the "final" decision, despite the fact that it was subsequently unfinalized.

Under the circumstances, plaintiff's appeal should be regarded as timely,[17] and the Board should proceed to decide the dispute on its merits.[18]

## CONCLUSION

Further proceedings on plaintiffs' motion and defendant's cross-motion for summary judgment on the sixth and seventh causes of action are, under Rule 167(a) and (e), stayed for a period of six months to enable plaintiffs to obtain from the General Services Board of Contract Appeals determinations of (a) whether, in connection with the sixth cause of action, plaintiffs encountered such a changed condition as would entitle them to an equitable adjustment under Article 4 of the contract, and (b) whether, in connection with the seventh cause of action, plaintiffs are, on the basis of the proper interpretation of the specifications, entitled to an equitable adjustment under Article 3 of the contract with respect to the installation of the glass involved in this claim.

15. "Army Procurement Procedure * * * required the contracting officer to furnish the contractor with findings of fact and include in his decision a paragraph advising the contractor of his right to appeal. The letter of June 23, 1955, did not comply with the regulations and, hence, cannot be treated as a final decision of the contracting officer. * * * "

16. In Jacobsen Constr. Co., GSBCA 66-2 BCA ¶ 6040, the Board held, with respect to the regulation here involved: "The requirements of the agency regulations are mandatory." (at 27,911)

17. Cf. Norair Engineering Corp., GSBCA 2532, 68-1 BCA ¶ 6968, where the contracting officer's "final" decision also failed to comply with the regulation here involved but the Board concluded that it would serve only to prolong the adjudication and final disposition of the claim to have it returned to the contracting officer for the issuance of another decision which was in compliance. In Norair, the Board agreed with the contractor's contention "that the 30-day appeal period does not start to run unless the Contracting Officer complies with" regulation 5–53.602. (at 32,211)

18. Plaintiff argues that, since only a question of law is involved, i. e., the proper interpretation of the specifications, no appeal to the Board is necessary, so that the court may retain and decide the basic issue involved. However, since the dispute is susceptible of administrative adjustment, the contention cannot be sustained. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 837, 170 Ct.Cl. 757, 763–764 (1965). Plaintiff's identical contention was overruled by the commissioner's "Order re Further Proceedings and Scope of Trial" filed May 29, 1969, from which plaintiff did not appeal.