**RA-NAV LABORATORIES, INC., Appellant,**

v.

**Sheila WIDNALL, Secretary of the Air Force, Appellee.**

No. 97–1259.

United States Court of Appeals, Federal Circuit.

March 4, 1998.

Rehearing Denied; Suggestion for Rehearing In Banc Declined May 20, 1998.

Theodore M. Bailey, San Antonio, TX, argued for appellant.

Robert Steinbuch, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director. Of counsel was Rebecca E. Pearson, Department of the Air Force, Arlington, VA.

Before RICH, LOURIE, and GAJARSA, Circuit Judges.

LOURIE, Circuit Judge.

Ra-Nav Laboratories, Inc. appeals from the final decision of the Armed Services Board of Contract Appeals dismissing its appeal for lack of jurisdiction. *Ra–Nav Lab., Inc.*, ASBCA No. 49211, 96–2 BC ¶ 28,514 (Aug. 26, 1996), *reconsideration denied*, 97–1 BC ¶ 28,650 (Nov. 22, 1996). Because the Board did not err in determining that the appeal period of 41 U.S.C. § 606 (1994) had run before Ra–Nav filed its appeal, we affirm.

BACKGROUND

In 1985, Ra–Nav was awarded a government contract for the production of data tape cartridges. In early 1986, when Ra–Nav failed to timely deliver the first installment of tapes due under the contract (the "First Articles"), the government terminated the contract for default. The Default Notice stated that:

[t]his is the final decision of the termination contracting officer [TCO]. This deci-

sion may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or otherwise furnish written notice thereof to the [Board] ... within 90 days from the date you received this decision....

Following the Default Notice, Ra–Nav sent a letter to the TCO requesting that the contract be reinstated with an extended delivery schedule. In response, the TCO sent Ra–Nav a letter on January 29, 1986 ("Cautionary Notice"), which stated in relevant part:

2. The contents of your letter did not reveal an excusable reason for your failure to deliver the First Articles....

2. [sic] This is to advise you:

   a. *The default remains in effect and the contract is not reinstated.*

   b. *The Government is not encouraging you to continue performance.*

   c. *Any continued performance will be voluntary on your part and at your own risk.*

3. *In order to mitigate your damages,* the Government agrees to inspect completed First Articles provided:

   a. They are submitted to the Government by 15 Mar 86....

   b. The defaulted item is still required by the Government at the time you present them for inspection/testing....

   c. A reprocurement contract has not been awarded by the time you present the First Articles for inspection/testing.

   ....

4. If the First Articles meet the contract requirements, you agree to a sufficient decrease in contract price to cover the administrative damages to issue the default, initiation, processing of the reprocurement to the point of cancellations, delivery schedule extension, rescision [sic] of the default, reinstatement of the contract.

5. *The Default Notice and the appeal periods specified in the Default Notice are not changed as a result of the above comments.*

(emphasis added). Following this letter, Ra–Nav continued to attempt to provide suitable First Articles until late 1986, during which period the parties sent several communications to each other. Most of the correspondence from the government made specific reference to the "conditions" specified in the Cautionary Notice, although the appeal period was not specifically mentioned.

In April 1987, the government notified Ra–Nav that its latest submission of First Articles had been rejected and indicated that it would accept no further resubmissions. The government awarded reprocurement contracts in March 1987 and August 1987 to two other data tape cartridge manufacturers.

Over six years later, in September 1993, the government notified Ra–Nav that it desired to recover progress payments paid to Ra–Nav during the performance of the contract. In November 1993, Ra–Nav expressed its intention to "[a]ppeal this termination for default and the demand for excess reprocurement charges as soon as a final determination of the termination contracting officer was issued" and noted that it had requested a final determination as far back as late 1987. Ra–Nav alternatively proposed a settlement in which the termination for default would be changed to one for convenience, which would have the effect of nullifying Ra–Nav's claim for its contract expenses and the government's claim to recoup the progress payments. The TCO expressed an interest in Ra–Nav's proposal and requested evidence supporting Ra–Nav's claim. However, in September 1994, Ra–Nav revoked its proposal because "it could not walk away from the over $100,000" difference between its contract expenses claim and the government's progress payments claim.

In May 1995, the government informed Ra–Nav that it would not seek to recoup the progress payments. Ra–Nav then submitted its claim for contract expenses to the TCO; it went unanswered. In October 1995, over eight years after the termination of its con-

tract, Ra–Nav appealed the "deemed denial" [1] of its claim to the Board.

The Board dismissed Ra–Nav's appeal for lack of jurisdiction on the ground that Ra–Nav's appeal was not taken within ninety days of the termination for default. *See* 41 U.S.C. § 606 (1994) ("Within ninety days from the date of receipt of a contracting officer's decision under section 605 of this title, the contractor may appeal such decision to an agency board of contract appeals, as provided in section 607 of this title."). Ra–Nav appeals the dismissal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (1994).

## DISCUSSION

The standard under which we review a decision of the Board is dictated by the Contract Disputes Act, which provides in relevant part:

> the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (1994). We review questions of law, including whether jurisdiction exists under section 606, *de novo*. *See D.L. Braughler Co. v. West,* 127 F.3d 1476, 1479–80 (Fed.Cir.1997) (citations omitted). Notwithstanding this lack of deference concerning questions of law, "legal interpretations by tribunals having expertise are helpful to us, even if not compelling." *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 814 (Fed. Cir.1984).

Ra-Nav argues that its appeal to the Board was timely because the contract was still in effect. The cornerstone of Ra–Nav's argument is that it was reasonable in believing that the termination of the contract in January 1986 had been reconsidered or "viti-

ated" by the events subsequent to the termination.

The government responds that substantial record evidence supports the Board's finding that the government did not reconsider its decision to terminate the contract, and therefore that the appeal period had expired many years before. The government asserts that the Cautionary Notice clearly warned Ra–Nav that (1) the default termination would remain in effect even if Ra–Nav tried to continue performance, (2) the government did not encourage Ra–Nav to continue performance, (3) Ra–Nav proceeded at its own risk, and (4) the period during which Ra–Nav could appeal the termination would remain unchanged. The government also questions the reasonableness of Ra–Nav's belief that the termination had been vitiated, and points out that the interaction between the government and Ra–Nav subsequent to the termination of the contract was consistent with the stated purpose of the Cautionary Notice, *viz.,* mitigation of Ra–Nav's damages for default.

We agree with the government's arguments. Specifically, we disagree with Ra-Nav that the TCO, through his actions subsequent to the default termination, reinstated the contract. Reinstatement of a contract terminated for default is provided for by regulation, which reads as follows:

> Notwithstanding [other termination for default regulations], the contracting officer may, with the written consent of the contractor, reinstate the terminated contract by amending the notice of termination, after a written determination is made that the supplies or services are still required and reinstatement is advantageous to the Government.

48 C.F.R. § 49.401(e) (1997). It requires amendment of the notice of termination and a written determination that the supplies are still required and that reinstatement is advantageous to the government. Whatever the requirements are for amending the notice of termination, they surely must indicate a clear and unequivocal desire to reinstate the

---

**1.** *See* 41 U.S.C. § 605(c)(5) (1994) ("Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting offi-

cer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter.").

contract. This did not occur here. On the contrary, the TCO's actions did not reinstate the contract; they were completely consistent with what the Cautionary Notice stated, *viz.,* only allowing Ra–Nav to mitigate its damages. That Ra–Nav was on notice that the TCO had not reinstated the contract was further underscored by the government's continuing reference to that notice in its subsequent correspondence.

Ra-Nav argues that precedent indicates that actions of a contracting officer short of express clear and unequivocal action can suffice to reinstate a terminated contract. In support, Ra-Nav devotes a substantial portion of its brief to arguing the applicability of *Roscoe–Ajax Construction Co. v. United States,* 198 Ct.Cl. 133, 458 F.2d 55 (1972), to its appeal. Ra–Nav cites *Roscoe* for the proposition that a decision by a contracting officer to terminate a contract can be "vitiated" by the contracting officer's subsequent conduct. Ra–Nav further postulates that whether the decision to terminate is vitiated is governed by a reasonableness standard. Ra–Nav then points to conduct described in the record that shows the reasonableness of its position. In particular, Ra–Nav notes that: (1) the TCO did not make it clear in his correspondence with Ra–Nav that the appeal period was still running; (2) the reference to "conditions" in subsequent correspondence did not refer to the appeal period; (3) the TCO encouraged Ra–Nav to continue performing post-termination; (4) the government took several months to seek reprocurement from other suppliers, thereby convincing Ra–Nav that the contract was still in effect; (5) a letter from the TCO dated April 18, 1986 set a date for resubmission of the First Articles that was five days past the expiration of the appeal period, and which contained no reference to the original termination decision; (6) in the April 18th letter, the government, in what Ra–Nav calls a new spirit of cooperation, allowed Ra–Nav to use government test equipment; (7) the government did not aggressively pursue recovery of progress payments made to Ra–Nav or reprocurement costs against Ra–Nav; (8) Ra-Nav believed that the government would issue a new final termination decision when the government decided to pursue repro-

curement options; and (9) the government's consideration of Ra–Nav's settlement proposal in 1993–94 evidenced that both parties thought the contract to still be in effect.

We disagree with Ra–Nav that *Roscoe* is controlling. In *Roscoe,* the contractor and the contracting officer (CO) were in dispute as to whether a contract for glass installation specified that the glass should be set with glazing putty or caulking. *Roscoe,* 458 F.2d at 61. In a letter dated January 16, 1962, the CO, after reviewing the contract's specification, directed the contractor to use caulking. *Id.* When the contractor continued to disagree and offered to meet with the CO to further discuss the dispute, the CO advised the contractor by letter that "in accordance with your request to hold a meeting to discuss the glazing of the glass[,] I will be happy to meet with you." *Id.* (ellipses removed). After the meeting, the CO in a letter dated May 7, 1962, reaffirmed his understanding that the contract called for caulking and referred the contractor to "our letter of January 16, 1962, wherein we gave you our written decision." *Id.* at 62. The contractor then appealed to the General Services Board of Contract Appeals as required by the "disputes clause" in the contract. *Id.* The government moved to dismiss the appeal because it was not taken within thirty days of the CO's final decision, as required by the contract, and insisted that January 16 was the date of the CO's final decision. *Id.* In response, the contractor alleged that May 7 was the date of the CO's final decision, and that its appeal was therefore timely. *Id.*

The Board in *Roscoe* agreed with the government and held that the letter of January 16 was the "decision of the [CO] on the matter in dispute and was binding on the Appellant within the meaning of the [d]isputes clause." *Id.* The Court of Claims disagreed:

The [CO's] decision of January 16, 1962, was not, as the Board held, "the final decision," for, obviously, the contracting officer's agreement shortly thereafter to meet with the [contractor] and its subcontractor, and to reconsider the question, served to keep the matter open and neces-

sarily destroyed any finality the decision theretofore had.

*Id.* at 63. Instead, the Court of Claims agreed with the contractor that the May 7 letter was the final decision from which the appeal period specified by the disputes clause began to run. *Id.*

*Roscoe* does not govern the present appeal; it did not involve a clear decision of a contracting officer to terminate a contract. The appealed issue in *Roscoe* involved a dispute over contract interpretation; nothing in *Roscoe* suggested that the contract had been terminated by the CO on January 16, 1962. It is therefore incorrect to extend *Roscoe*, which involved the informal reconsideration by a contracting officer of his letter interpreting a contractual provision, to a situation in which a contract has been clearly terminated.

The Default Notice in this case clearly stated that it was a final decision of the TCO, made pursuant to the requirements of the Contract Disputes Act; it clearly indicated that further work on First Articles would only be to mitigate damages, not to reinstate the contract. All of the subsequent correspondence and activity were consistent with this interpretation. Neither *Roscoe* nor any other controlling authority of which we are aware indicates that the factors recited by Ra–Nav show that the present contract was reinstated.

Substantial evidence supports the conclusions that the TCO clearly terminated the Ra–Nav contract on January 24, 1986, that Ra–Nav received the Default Notice, and that the Default Notice clearly specified Ra–Nav's appeal options. At that point, the section 606 appeal period began to run, and the informal actions of the TCO in light of the Cautionary Notice could leave no doubt that Ra–Nav had ninety days within which to appeal the termination to the Board. Such actions by the TCO did not constitute reinstatement of the contract.

## CONCLUSION

The Armed Services Board of Contract Appeals did not err in dismissing Ra–Nav's appeal because it was not taken within ninety days of its receipt of the TCO's final decision to terminate its contract for default. Accordingly, the decision of the Board is

*AFFIRMED.*